# United States Court of Appeals
## For the First Circuit

No. 12-2226

ANTONIO VELÁZQUEZ-PÉREZ,

Plaintiff, Appellant,

v.

DEVELOPERS DIVERSIFIED REALTY CORP.; DDR PR VENTURES II LLC,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. Gustavo A. Gelpí, U.S. District Judge]

Before
Torruella, Baldock,[*] and Kayatta,
Circuit Judges.

Anibal Escanellas-Rivera, with whom Escanellas & Juan, P.S.C. was on brief, for appellant.
Carl Schuster, with whom Migdalí Ramos Rivera and Schuster Aquiló LLP, were on brief, for appellees.
Susan R. Oxford, Attorney, U.S. Equal Employment Opportunity Commission, with whom P. David Lopez, General Counsel, Carolyn L. Wheeler, Acting Associate General Counsel, and Lorraine C. Davis, Assistant General Counsel, were on brief, for amicus curiae Equal Employment Opportunity Commission.

May 23, 2014

---

[*] Of the Tenth Circuit, sitting by designation.

**KAYATTA, Circuit Judge**.  This appeal involves several issues, including a legal question we have not previously considered:  Under what circumstances, if any, can an employer be held liable for sex discrimination under Title VII of the Civil Rights Act of 1964 when it terminates a worker whose job performance has been maligned by a jilted co-worker intent on revenge?  We answer that the employer faces liability if: the co-worker acted, for discriminatory reasons, with the intent to cause the plaintiff's firing; the co-worker's actions were in fact the proximate cause of the termination; and the employer allowed the co-worker's acts to achieve their desired effect though it knew (or reasonably should have known) of the discriminatory motivation.

Based on this answer, and on our consideration of the terminated employee's claims of harassment and retaliation for asserting rights under Title VII, we vacate in part the grant of summary judgment against the employee on his sex discrimination claim, and otherwise affirm the judgment of the district court.

## I. Background

Antonio Velázquez-Pérez (Velázquez) sues his former employer, DDR Corp.,[1] for sex discrimination and retaliation under Title VII.  Recognizing that the district court granted summary judgment to DDR before any factfinder could evaluate the competing

---

[1]  Although the defendant's name appears in the caption as Developers Diversified Real Estate Corp., the defendant has informed us that its name has changed to DDR Corp.

-2-

evidence and inferences, we describe the facts giving rise to this lawsuit in a light as favorable to Velázquez as the record will reasonably allow, without implying that the following is what actually occurred. <u>Travers</u> v. <u>Flight Servs. & Sys., Inc.</u>, 737 F.3d 144, 145 (1st Cir. 2013).

In June 2007, Velázquez began work as an operations manager for DDR, a company that owns and manages shopping centers. In November 2007, the company promoted Velázquez to the position of regional general manager at the company, which he held until DDR fired him on August 25, 2008. In that role, Velázquez oversaw several of DDR's properties and managed a number of subordinates. Velázquez was directly supervised by Rolando Albino and indirectly supervised by Albino's boss, Francis Xavier González ("González"), who was in charge of the company's operations in Puerto Rico.

Velázquez, a man, also interacted extensively at work with a woman named Rosa Martínez. Martínez was the representative of DDR's human resources department for Puerto Rico. Her portfolio included both human resources and accounting duties. As a human resources manager, she provided advice to management on human resource issues, including employee discipline. In performing her accounting duties, she also gave direction to company managers, including Velázquez, on their compliance with company budget and accounting practices.

Velázquez and Martínez communicated frequently by phone and email. Velázquez admits that during the first ten months of his employment he had a good working relationship with Martínez. The two sometimes flirted with each other, and when Martínez occasionally expressed her romantic interest more explicitly, Velázquez gently rebuffed her.[2] Velázquez does not claim that he perceived Martínez's behavior during this period as harassing.

Velázquez testified, however, that any flirtatious relationship with Martínez ended in April 2008. On April 10, they had both traveled to the United States for a company meeting and were staying at the same hotel. That evening, Velázquez was walking in the hotel with two female employees of DDR when Martínez appeared in their path. Martínez asked, "what are you guys doing?" Martínez followed Velázquez to his room and, when Velázquez opened his door, tried to force her way in, then stood outside the door. When Velázquez threatened to call security, Martínez left. Immediately afterwards, Martínez sent multiple emails to Velázquez and one of the women he was with, suggesting that Velázquez was going to have sex with the woman. Martínez also called Velázquez's room multiple times.

---

[2] For example, Martínez wrote in an email, "[i]t[]is not easy to stay within my five senses with you. . . . [B]ut of course I will contain myself. . . . [I]t is quite easy to love you." In the same email exchange, Velázquez wrote, "No matter if you are miss universe and the woman of my dreams, I would never put in jeopardy my work environment."

In the days after the incident, Velázquez and Martínez exchanged angry emails in which Velázquez firmly stated that he had no interest in a romantic relationship and asked Martínez to respect that decision.[3]  Martínez responded angrily, making statements that Velázquez perceived as threatening to have him fired for rejecting her.  Martínez wrote, for example, "I don't have to take revenge on anyone; if somebody knows your professional weaknesses, that person is me."  In another email in the same chain, Martínez said, "you disappoint me and . . . are not even half of what you boast you are," adding, "I cannot allow any of you to risk the team's success."  Furthering supporting his perception that Martínez was threatening him, Velázquez cites testimony from one of their co-workers who reportedly heard Martínez tell Velázquez, "you are nothing without me," in a way that the co-worker thought was meant to be intimidating.

Shortly after the hotel encounter, Velázquez complained orally about Martínez's behavior to his supervisor Albino.  Albino advised Velázquez to "[s]end [Martínez] a conciliatory email" because, if Velázquez did not, "[s]he's going to get you terminated."  Then, Albino and another man jokingly suggested to Velázquez that he should have sex with Martínez.  In the summer of

_____

[3]  For example, Velázquez said to Martínez: "I would . . . never reciprocate what you felt"; "I will contact you merely for professional matters"; and, "You have to stop being jealous . . . [Y]ou are married and I have [J]anily [Velázquez's wife]."

2008, Velázquez complained further about Martínez's behavior to both Albino and González.  Though Velázquez never filed a written complaint, DDR does not claim that it maintained any formal complaint procedure with which Velázquez failed to comply.

Meanwhile, Martínez began discussing Velázquez's job performance with Albino and González, including copying them on emails to Velázquez which can be read as critical of his work. Martínez, Albino, and González began to extensively discuss a number of other accusations against Velázquez in August 2008 that originated from sources other than Martínez, including Albino's own criticisms of his subordinate's work.  Martínez summarized the allegations against Velázquez in an email to the others on August 18, 2008, stating "I understand that you need to verify the following issues in your meeting that were brought to my attention by the staff, which, if confirmed, I understand, and in comparison with other previous situations, would cause the termination of employment."

Two days later, Albino sent a memo to Martínez and González detailing a meeting with Velázquez's subordinates, which Albino suggested largely confirmed the allegations against Velázquez.  Albino concluded that Velázquez needed to be disciplined and, "if necessary," fired.  But González, the top company official in Puerto Rico, thought that termination was not yet justified, writing that he would instead issue a "formal

warning memo" and "recommend a 30 day PIP [Performance Improvement Plan]" to encourage Velázquez to "improve in his attendance and punctuality."

Martínez, however, was not to be deterred so easily in her attempt to convince Velázquez's bosses to fire him. In an email sent on the afternoon of August 21, she responded that she was "obligated to refer this" to two senior officials at the company's headquarters in Ohio: Nan Zieleniec, the company's Senior Vice-President for Human Resources, and Diane Kaufman, the Director of Employment and Employee Relations.

That same day, Velázquez saw Martínez at a hotel in Michigan where they both were staying for a business meeting. When Velázquez got in an elevator to go to his hotel room, Martínez followed him into the elevator and then out when he got to his floor. Martínez told Velázquez that she didn't love her husband, that she did love Velázquez, and that she wanted to have a romantic relationship with him. Velázquez found Martínez's statements and conduct to be disturbing, like those of "a mentally ill person." He told Martínez that he did not want to have a romantic relationship with her and that she should stop following him, which she eventually did.

Later that night, Martínez sent an email to Zieleniec and Kaufman in Ohio. Although that email included her earlier correspondence with González, she did not copy him on the email.

In a long note, Martínez wrote that she was "in disagreement with having this person in a PIP plan," as González had suggested, "because his behavior has been against the company code of conduct and has already impacted the trust from other team members." Martínez continued: "It is my recommendation this person is terminated immediately."

Four days later, on August 25, 2008, Velázquez was summoned to a meeting with Albino and González. After González asked Velázquez about his absences from work, and received answers he regarded as inconsistent with what Martínez and Albino had told him, González decided to terminate Velázquez's employment. On a written form, the reasons listed for Velázquez's firing were "[a]bsenteeism," "[f]ailure to report," and "[u]nsatisfactory performance."[4]

## II. Standard of Review

We review de novo the district court's grant of summary judgment to DDR. McArdle v. Town of Dracut, 732 F.3d 29, 32 (1st Cir. 2013). Under Federal Rule of Civil Procedure 56, a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if "a reasonable jury, drawing favorable inferences,

---

[4] The termination form was signed by Martínez, although Velázquez does not make any argument based on that fact or even mention it.

could resolve it in favor of the nonmoving party. . . . Conclusory allegations, improbable inferences, and unsupported speculation, are insufficient to establish a genuine dispute of fact." <u>Triangle Trading Co.</u> v. <u>Robroy Indus.</u>, 200 F.3d 1, 2 (1st Cir. 1999) (internal citations, quotation marks, and alterations omitted).

### III. Analysis

Velázquez alleges that DDR discriminated against him on the basis of sex in violation of Title VII, both in terminating him and in subjecting him to a hostile workplace. He also claims that DDR retaliated against him for complaining of sexual harassment. We start with his two discrimination claims, then turn to his retaliation claim.

### A. Alleged Termination for Refusing Sexual Advances

Velázquez claims that Martínez caused his termination because he rebuffed her sexual advances. We consider first whether a reasonable jury could so find based on the record in this case. Second, because precedent delineates special rules for discrimination by supervisors, as opposed to co-workers, we discuss whether a reasonable jury could find that Martínez was Velázquez's supervisor. Answering "no," we then tackle the question of whether a plaintiff in Velázquez's situation can nevertheless prevail under Title VII on a claim for discriminatory termination under a so-called quid pro quo theory. <u>See</u> <u>Lipsett</u> v. <u>Univ. of Puerto Rico</u>, 864 F.2d 881, 897 (1st Cir. 1988) (explaining that quid pro quo

harassment occurs "when a supervisor conditions the granting of an economic or other job benefit upon the receipt of sexual favors from a subordinate, or punishes that subordinate for refusing to comply").

**1. A reasonable jury could find that Martínez's discriminatory efforts were the proximate cause of Velázquez's firing.**

Viewing the evidence in a light favorable to Velázquez, drawing reasonable inferences in his favor, and resolving issues of credibility in his favor as well, a jury could reasonably decide that Martínez conveyed to Velázquez a threat: engage in a romantic and sexual relationship with me, or I will manage to undercut you at work and get you fired. Velázquez first perceived that threat in the emails Martínez sent him right after he rebuffed her at a hotel in April, and a rational jury could find his perception reasonable. Indeed, when he reported Martínez's behavior to Albino, his boss, Albino construed Martínez's intentions in precisely that manner, telling Velázquez he should try to repair his relationship with Martínez--perhaps by sleeping with her-- because if Velázquez did not, "[s]he's going to get you terminated."

Over the following summer, Martínez harshly criticized Velázquez in emails to him and emails to Albino and González. It also appears that Velázquez may have unintentionally aided her efforts by failing to comply with Albino's directions on several

-10-

matters. Once Martínez had compiled an arsenal of allegations against Velázquez, she then expressed her romantic interest one last time in their second hotel encounter. And when he again rebuffed her, Martínez set to carrying out her threat.

Continuing to view the evidence favorably to Velázquez, a jury could find that Martínez's efforts served as a proximate cause of Velázquez's discharge, as required in these circumstances by Staub v. Proctor Hosp., 131 S. Ct. 1186, 1194 (2011).[5] Martínez's efforts culminated in her email to Zieleniec and Kaufman, senior company officials in Ohio, in which Martínez provided a long list of accusations against Velázquez and a strong recommendation that he should be fired. At the time of the email, González had accumulated a significant amount of information about Velázquez's absences, tardiness, violations of company rules, relations with contractors, and poor supervision of staff. He nevertheless announced his intention not to fire Velázquez yet, deciding instead to issue a thirty-day performance improvement plan. When González so informed Martínez, she balked, telling González that she was "obligated to refer this" to senior human

---

[5] The plaintiff in Staub sued under the Uniformed Services Employment and Reemployment Rights Act (USERRA). Staub, 131 S. Ct. at 1190. The Supreme Court noted that USERRA is "very similar to Title VII," particularly with respect to its causation requirement. Id. at 1191. Although Staub's holding was limited to discrimination by supervisors, we discuss below why a similar theory should be available where the discriminator is a co-worker, if the plaintiff can establish that the employer acted negligently.

-11-

resources officials in Ohio.  She did so, and Velázquez was fired within days, apparently after Kaufman "questioned [González] about why he recommended a [performance improvement plan]" and told him "they did not see another way out other than termination."  While González claims that he changed his mind because Velázquez lied to him in their final meeting, the record would not compel a jury to accept that testimony.  Instead, the record would allow a reasonable factfinder to view Martínez's persistent and forceful lobbying as a proximate cause of the discharge.

**2.  No reasonable jury could find that Martínez was Velázquez's supervisor.**

If Martínez were Velázquez's supervisor, then the reasonable findings described above would render DDR vicariously liable.  See Staub, 131 S. Ct. at 1194; Vance v. Ball State Univ., 133 S. Ct. 2434, 2439 (2013).  Velázquez does argue that Martínez was his supervisor, but we do not agree that a reasonable jury could so conclude.

In Noviello v. Boston, 398 F.3d 76 (1st Cir. 2005), we held that the "key to determining supervisory status is the degree of authority possessed by the putative supervisor."  Id. at 95. The extent of a worker's authority is determined not by "nomenclature," but rather by an examination of "actual authority." Id. at 96.  And the relevant authority "primarily consists of the power to hire, fire, demote, promote, transfer, or discipline an

-12-

employee." Id. (quoting Parkins v. Civil Constructors of Ill., Inc., 163 F.3d 1027, 1034 (7th Cir. 1998)).

In Vance, the Supreme Court expressly confirmed that Noviello applied the proper standard in determining whether a given employee is a "supervisor" for the purpose of making the employer vicariously liable. Vance, 133 S. Ct. at 2453. Vance further trains the relevant inquiry on whether the "employer has empowered that employee to take tangible employment actions against a victim, i.e., to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."[6] Id. at 2443 (quoting Burlington Indus. v. Ellerth, 524 U.S. 742, 761 (1998)). In adopting this standard, the Supreme Court rejected as "nebulous" and a "study in ambiguity" a broader and more "open-ended test for supervisory status" advocated by the EEOC. Id. at 2443, 49. The Court aimed to adopt a standard that "can be readily applied," and that can "very often be resolved as a matter of law before trial." Id. at 2449-50.

As Vance recognizes, at some point the ability to provide advice and feedback may rise to the level of delegated authority sufficient to make someone a supervisor. Id. at 2452. For

_____

[6] Although Vance says that it adopts the same test we used in Noviello, the description of "tangible employment action" in Vance omits the reference to "discipline" contained in Noviello. Exactly how to reconcile these conflicting indicators is not material to this case.

example, where the employer vests formal authority in a person who, due to physical remoteness, must rely entirely (or, perhaps, mostly) on the recommendation of another, the person whose recommendation is relied upon may be deemed to have been delegated the authority to make the decision.  Id. (citing Rhodes v. Illinois Dept. of Transp., 359 F.3d 498, 509 (7th Cir. 2004) (Rovner, J., concurring in part and concurring in judgment)).  There is nothing in Vance, though, to warrant ignoring the difference between providing advice and feedback to one who has independent sources of information and truly makes the decision, and providing a recommendation to one whose acceptance of the recommendation is pro forma.  Vance makes clear that the latter situation can support a finding of delegated supervisory authority.  Were we also to treat the former situation as such a delegation, much of the clarity and predictability Vance seeks to ensure would be lost.

Here, setting aside Velázquez's conclusory testimony, there is no evidence that DDR delegated to Martínez any relevant authority over any tangible employment actions affecting Velázquez (including the authority to discipline him).  At most she possessed some limited "responsibility to direct" Velázquez in certain accounting and human resource protocols, a type of responsibility rejected in Vance as insufficient to make one a supervisor.  Id. at 2452.  The record is clear that Albino was Velázquez's direct boss, and that Albino's boss, González, decided whether and how to

-14-

discipline or reward Velázquez. The corporate structure in this sense was a classic line and staff structure in which Albino and González were the line supervisors, one above the other, while Martínez filled a supporting staff function, providing advice and assistance in her capacity as a member of the human resource department, as well as feedback based on her own direct interactions with González's subordinates.

When Albino and González began to consider firing Velázquez, they undertook to gather information about him from numerous sources, even interviewing those who worked for him. Martínez's own actions further demonstrate that she lacked the authority to fire or even discipline Velázquez. Rather, she needed to lobby others--especially González--who had the authority in form and in fact. That she was successful may show that she was a formidable adversary as a co-worker, just as Albino warned, but it does not make her Velázquez's supervisor as defined in Vance.

In applying Vance and Noviello in this manner, we recognize that those cases involved claims of hostile environment sexual harassment, not claims of quid pro quo harassment. But we see no reason why a person might be deemed to be a supervisor in connection with one type of harassment and not the other, or why the distinction between supervisors and co-workers, underscored so strongly in Vance, would cease to matter in the context of quid pro quo harassment. On the contrary, the language of Vance suggests

-15-

that its limitation on vicarious liability applies more broadly, to all forms of "unlawful harassment." See 133 S. Ct. at 2443. And Vance includes within its conception of harassment those situations in which "harassment culminates in a tangible employment action," i.e., quid pro quo harassment. Id. at 2439. See also Perez-Cordero v. Wal-Mart Puerto Rico, Inc., 656 F.3d 19, 26 (1st Cir. 2011) (classifying quid pro quo as a form of sexual harassment). So, too, Vance's emphasis on the value of less complex rules in this area of the law counsels for applications of its holding to all forms of harassment.

**3. DDR could nevertheless be found liable for negligently allowing Martínez's discriminatory acts to cause Velázquez's firing.**

Our conclusion that Martínez was not a supervisor does not necessarily absolve DDR of potential liability for Velázquez's discharge. The Supreme Court has not yet ruled on the precise question of whether employer liability premised on a finding of negligence can be limited to cases of "hostile workplace" discrimination, as opposed to discriminatory termination. See Staub v. Proctor Hosp., 131 S. Ct. 1186, 1194 n.4 (2011) ("We express no view as to whether the employer would be liable if a co-worker, rather than a supervisor, committed a discriminatory act that influenced the ultimate employment decision."). The Court has cautioned, though, that the distinction between hostile workplace claims and quid pro quo claims is "of limited utility." Burlington

<u>Indus.</u> v. <u>Ellerth</u>, 524 U.S. 742, 751 (1998). And we see no basis for applying that distinction to permit a negligent employer to escape (or incur) liability on one type of claim but not the other. The same considerations of simplicity touted in <u>Vance</u> that counsel against heightening the potential for liability on quid pro quo claims counsel as well against lessening the potential for liability.

Suppose, for example, that a white employee repeatedly taunts a black co-worker with vicious racial epithets and also lodges a series of false complaints about the victim to their supervisor in a racially-motivated attempt to have the victim fired. Certainly the employer could be held liable for negligently permitting the taunting. <u>Vance</u>, 133 S. Ct. at 2439. So, too, the employer should be liable if it fires the victim based on complaints that it knew (or reasonably should have known) were the product of discriminatory animus. In either situation, the same elements are present: an act of discrimination is allowed to cause harm by an employer that knows or reasonably should know of the

discrimination. Other courts have reached the same conclusion, at least implicitly.[7]

In short, an employer can be held liable under Title VII if: the plaintiff's co-worker makes statements maligning the plaintiff, for discriminatory reasons and with the intent to cause the plaintiff's firing; the co-worker's discriminatory acts proximately cause the plaintiff to be fired; and the employer acts negligently by allowing the co-worker's acts to achieve their desired effect though it knows (or reasonably should know) of the discriminatory motivation. Here, a reasonable jury applying this test could find in favor of Velázquez.

## B. Hostile Workplace Claim

As to Velázquez's more traditional hostile workplace claim, we agree with the district court that it offers no independent route to a judgment for Velázquez. To prevail on the claim, Velázquez would have to show that harassment was "so severe or pervasive as to alter the conditions of [his] employment and

---

[7] See, e.g., Flitton v. Primary Residential Mortgage, Inc., 238 F. App'x 410, 418 & n.5 (10th Cir. 2007) (finding that a discriminatory termination claim could be supported by discriminatory comments by someone the plaintiff reported to, but who was not labeled a supervisor and did not make the decision to fire her); Oakstone v. Postmaster Gen., 332 F. Supp. 2d 261, 273 (D. Me. 2004) (holding that an employer could be held liable on a negligence theory for taking tangible employment actions based on a co-worker's discriminatory reports); see also Johnson v. Koppers, Inc., 726 F.3d 910, 915 (7th Cir. 2013) (assuming that a co-worker's discriminatory report could support a Title VII discriminatory termination claim, but rejecting the claim because the report was not the proximate cause of the termination).

create an abusive working environment." Faragher v. City of Boca Raton, 524 U.S. 775, 786 (1998) (internal quotation marks omitted). Aiming to prevent Title VII from becoming a "general civility code," the Supreme Court has held that a plaintiff must show that the "sexually objectionable environment [was] both objectively and subjectively offensive," such that "a reasonable person would find [it] hostile and abusive" and the "victim in fact did perceive to be so." Id. at 787-88. Elaborating this latter requirement, we have held that a plaintiff alleging that sexual advances created a hostile workplace cannot prevail unless the advances were "unwelcome." O'Rourke v. City of Providence, 235 F.3d 713, 728 (1st Cir. 2001).

Here, we must rely on Velázquez's deposition testimony, along with a series of emails between him and Martínez, to determine whether he could prevail.[8] Reviewing this evidence, the district court ruled that Martínez's conduct was neither "unwelcome" nor "severe or pervasive." On the first point, the district court found that "the Plaintiffs and Martínez had the type of relationship where they . . . exchanged emails that were sometimes flirtatious, used vulgar language, had sexual content and were not work related." We disagree with the district court, but only in part: based on Velázquez's testimony, a reasonable jury

---

[8] Velázquez also submitted an affidavit, but the district court struck it as tardy, and Velázquez does not appeal that ruling.

could conclude that Martínez's advances were unwelcome after their falling out, but not before.  Velázquez has summarized his own testimony as stating that he "had a good working relationship with Martínez" until April 2008 but that "Martínez, since the month of April 2008, up until [his] termination, started to harass, discriminate and retaliate against [him] . . . ."  Indeed, Velázquez testified at his deposition that he started feeling intimidated by Martínez only "after the April incident" at the hotel.  Before that incident, their relationship was characterized by "trust," a "certain appreciation," and mutual flirtation, including the use of "double intender [sic] words."

The email evidence supports Velázquez's testimony, showing that he and Martínez once had a mutually flirtatious relationship that ended during their email exchange from April 10th to 12th following the first hotel incident.  During that exchange, Velázquez harshly rebuffed Martínez[9] and she reacted angrily.[10]  The talk was apparently cathartic, at least temporarily, as the final emails from both participants were calm and amicable.[11]

---

[9]  See footnote 3 above for specific examples.

[10]  For example, Martínez wrote: "God made me see that you were an instrument of evil and that sooner or later you were going to destroy me. He rescued me and showed me what you really are, and He made me see that you were pure darkness."

[11]  For example, Velázquez wrote: "I only want to tell you that you have a very special place in my heart."

Nevertheless, a reasonable jury could infer that any subsequent sexual advances by Martínez were unwelcome.

As a result, we examine Martínez's conduct after April 12, 2008, to determine whether a reasonable factfinder could view it as "severe or pervasive" harassment. At his deposition, Velázquez gave only extremely vague answers when asked how and when Martínez harassed him. For example, he testified that Martínez tried a couple of times to transform a kiss on the cheek to a kiss on the mouth, but he failed to provide any sense of when this occurred or whether the behavior continued after April. He similarly offered no temporal detail regarding his claim that Martínez made comments about his clothing.

Velázquez testified initially that "very strong, strong sexual harassment commenced in April" and that this harassment included requests to engage in sexual activity. But when asked for further specifics, Velázquez said, "I would have to review the emails to be specific" and "I can't be specific, because I don't have the emails in front of me." Velázquez, though, has never been able to point to any email showing conduct of this type after April 12, nor do we see one in the record.

Velázquez did also testify that during the one or two months after the April encounter, Martínez sent him an unspecified number of anonymous gifts such as chocolate, in at least one case including a note "to my little rascal." Further, he testified that

-21-

shortly before he was fired, Martínez confessed her love to him in a hotel in August 2008 during a conversation he perceived as a renewed effort to establish a sexual relationship. The conversation ended promptly when Velázquez told Martínez he did not want to have a romantic relationship with her.

Even viewing the record in the light most favorable to Velázquez, neither Martínez's gifts nor her comments at the hotel in August approach "severe" harassment under our precedent, particularly given the lack of physical touching, implicit physical coercion, extreme language, or obscene behavior. See Ponte v. Steelcase Inc., 741 F.3d 310, 314, 320-21 (1st Cir. 2014); Pomales v. Celulares Telefónica, Inc., 447 F.3d 79, 81, 83-84 (1st Cir. 2006). We doubt that a jury could even find these few post-April incidents hostile or abusive, in isolation or in aggregate. See Faragher, 524 U.S. at 787. See also Vega-Colón v. Wyeth Pharm., 625 F.3d 22, 32 (1st Cir. 2010). And, even if a jury found Martínez's actions hostile or abusive, a handful of relatively mild incidents over a five month period could not be deemed "pervasive" harassment. See Lee-Crespo v. Schering-Plough Del Caribe Inc., 354 F.3d 34, 46 (1st Cir. 2003). Even further assuming that the factfinder could add into the equation Martínez's criticisms of Velázquez's work, which were not explicitly sexual but may have been motivated by sexual rejection, Velázquez still could not show that the harassment reached the required level of severity or

pervasiveness. See Faragher, 524 U.S. at 788 (noting that the sexual harassment standard "filter[s] out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language . . . ." (internal quotation marks omitted)). Notably, Velázquez failed to offer any evidence that Martínez's behavior "unreasonably interfere[d] with [his] work performance." Id. at 787-88. See also Pomales, 447 F.3d at 84 (finding no actionable harassment in part due to the lack of evidence that the alleged conduct "negatively affected [the plaintiff's] ability to work as a . . . sales consultant"). Indeed, there is no evidence that Velázquez was aware of the bulk of the criticisms Martínez was surreptitiously feeding to his supervisors.

In sum, no unwelcome harassment occurred before the April falling out, and no severe or pervasive harassment occurred afterwards. If DDR's negligence allowed Martínez's retaliatory animus to play a causal role in its decision to terminate Velázquez, then he does indeed have a claim. But Velázquez has not shown that Martínez's conduct otherwise made his working environment objectively abusive before he was fired. We therefore hold that, if no discriminatory animus infected the termination decision, Velázquez could not prevail on a Title VII harassment claim with the evidence he has presented.

**C. Retaliation**

In addition to claiming sex discrimination, Velázquez asserts that DDR retaliated against him by firing him for complaining of discrimination. We first discuss the threshold issue of timeliness, then turn to the substance of Velázquez's claim.

Velázquez's retaliation claim arises from events in the spring and summer of 2008, culminating in his firing on August 25, 2008, the last act encompassed by his complaint. Velázquez filed his charge with the Equal Employment Opportunity Commission 185 days after he was fired, on February 26, 2009.

As a general rule, Title VII requires plaintiffs to file a retaliation charge within 180 days of the alleged act of retaliation. 42 U.S.C. § 2000e-5(e)(1). However, the limitations period expands to 300 days where the plaintiff has "initially instituted proceedings with a State or local agency with authority to grant or seek relief from such practice . . . ." Id. Thus, the questions here are (1) whether Velázquez "initially instituted proceedings with a State or local agency," specifically the Puerto Rico Department of Labor and Human Resources, and (2) whether that state agency had "authority to grant or seek relief from [the

challenged] practice."  The company argues that Velázquez fails on both counts.[12]

As to the first question, Velázquez admits that he did not submit his charge directly to the state agency.  He argues, however, that his filing at the EEOC automatically and simultaneously initiated proceeding at the Puerto Rico agency, pursuant to a worksharing agreement between the state agency and the EEOC.  In particular, that agreement provides:

> In order to facilitate the assertion of employment rights, the EEOC and the [Puerto Rico Department of Labor and Human Resources] each designate the other as its agent for the purpose of receiving and drafting charges . . . .  The EEOC's receipt of charges on the [Puerto Rico Department of Labor and Human Resources's] behalf will automatically initiate the proceedings of both the EEOC and the [Puerto Rico Department of Labor and Human Resources] for the purposes of [42 U.S.C. § 2000e-5(c) and (e)(1)].

The EEOC routinely uses worksharing agreements to facilitate "more streamlined and cooperative" relationships with state and local agencies, as it explained to this court in an amicus brief. Indeed, the Commission has used worksharing agreements for more than twenty-five years.  See EEOC v. Commercial Office Products, Co., 486 U.S. 107, 112 (1988) (noting that the EEOC had entered worksharing agreements with "approximately three-quarters of the 109 state and local agencies authorized to enforce state and local

---

[12]  The first question, at least, would seem to apply equally to Velazquez's sexual harassment claim and retaliation claim, although the company has not presented any timeliness challenge to the sexual harassment claim.

-25-

employment discrimination laws"). The EEOC agrees that under the worksharing agreement applicable here, Velázquez's filing "initially instituted proceedings" with the Puerto Rico agency. The commission explains that, under the agreement, a plaintiff who files with the EEOC has also filed with the Puerto Rico agency, which has designated the EEOC as its agent for receiving charges, and that the plaintiff has initiated proceedings with the Puerto Rico agency.

Many circuits have accepted that the EEOC may use worksharing agreements to achieve exactly this effect.[13] We join those circuits, confirming our prior dictum that "worksharing agreements can permit state proceedings to be automatically initiated when the EEOC receives the charge." E.E.O.C. v. Green, 76 F.3d 19, 23 (1st Cir. 1996). DDR correctly observes that our opinion in Green noted that the governing worksharing agreement in that case did not make clear whether the EEOC and state agency intended a filing with the EEOC to initiate proceedings at the state agency. Id. The EEOC has since updated its standard worksharing agreement, and the agreement here clearly provides that

---

[13] See Tewksbury v. Ottaway Newspapers, 192 F.3d 322, 327 (2d Cir. 1999); E.E.O.C. v. Techalloy Maryland, Inc., 894 F.2d 676, 679 (4th Cir. 1990); Griffin v. City of Dallas, 26 F.3d 610, 612 (5th Cir. 1994); Hong v. Children's Mem'l Hosp., 936 F.2d 967, 970 (7th Cir. 1991); E.E.O.C. v. Hacienda Hotel, 881 F.2d 1504, 1510 (9th Cir. 1989) overruled on other grounds by Burlington Indus. v. Ellerth, 524 U.S. 742 (1998).

-26-

a filing with the EEOC will simultaneously initiate proceedings at the Puerto Rico Department of Labor and Human Resources.[14]

We also conclude that the Puerto Rico agency had "authority to grant or seek relief" from the retaliation alleged by Velázquez. Puerto Rico law prohibits employers from retaliating against individuals who have complained of sexual harassment, a prohibition established by Act 17 passed in 1988. P.R. Laws Ann. tit. 29, § 155h. The Puerto Rico Department of Labor and Human Resources has statutory authority to enforce Act 17, see P.R. Laws Ann. tit. 3, § 308, and it established the Anti-Discrimination Unit to carry out that function. Under bylaws promulgated by the Department of Labor and Human Resources, the Anti-Discrimination Unit can investigate complaints of illegal discrimination or retaliation and can seek a remedy for such acts in court.

DDR nevertheless points out that at the time of Velázquez's filing, an EEOC regulation omitted Puerto Rico from a list of jurisdictions in which a local or state agency had authority to enforce a prohibition on retaliation related to sexual harassment. 29 C.F.R. § 1601.74(a) & n.5 (2008). The EEOC has acknowledged that the regulation became outdated when Puerto Rico passed Act 17 in 1988. Accordingly, the Commission has now amended the regulation to make clear that the Puerto Rico Department of

_____

[14] The company also claims that, even if Velázquez could have initiated proceedings at both agencies by filing with the EEOC, he chose not to. This claim is not supported by the evidence.

Labor has authority over "charges alleging retaliation for having opposed unlawful sexual harassment." 29 C.F.R. 1601.74 n.6 (2014). There is no dispute that the Puerto Rico agency has had such authority since at least 1988.[15]

We owe no deference to the erroneous prior version of the regulation, which does not purport to interpret any ambiguous language bearing on this case. See, e.g., United States v. Haggar Apparel Co., 526 U.S. 380, 392 (1999) (explaining that Chevron deference applies only to "agency[] statutory interpretation" that "fills a gap or defines a term in a way that is reasonable in light of the legislature's revealed design" (internal quotation marks omitted)). The language of Title VII clearly establishes the relevant requirement: the longer limitations period applies where a local or state agency had "authority to grant or seek relief from [the challenged] practice." 42 U.S.C. § 2000e-5(e)(1). Rather than attempting to fill any gap in the statute, the regulation provides a list, for public reference, of state and local agencies that have applied for and received formal recognition from the EEOC as having the authority to enforce anti-discrimination laws. 29 C.F.R. §§ 1601.70-1601.74 (2008). Moreover, the regulation itself explicitly provides that an agency lacking this formal designation

---

[15] The company claimed at oral argument that the department had such authority even before Act 17 was passed. But what matters for our purposes is only that the agency had it when Velázquez filed.

-28-

may nevertheless meet the statutory criteria and may be treated accordingly by the EEOC. 29 C.F.R. § 1601.70(b) (2008) ("[I]f the Commission is aware that an agency or authority meets the . . . criteria for . . . designation, the Commission shall defer charges to such agency or authority even though no request for . . . designation has been made."). Thus, even on its own terms, the regulation does not prevent Velázquez from utilizing the longer statute of limitations.[16]

The company in its brief argues that we should affirm the district court's decision on the alternative grounds that Velázquez's retaliation claim fails to survive summary judgment on its merits. Specifically, the company contends that Velázquez has not produced sufficient evidence to allow a reasonable jury to find that his complaints of discrimination caused him to be fired. This but-for causation requirement for a Title VII retaliation case differs materially from the "motivating factor" test applicable to Velázquez's discrimination claim. See University of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2532-33 (2013). To prevail at trial, Velázquez must show that he would not have been fired had he not complained.

---

[16] In so holding, we reject the conclusion of district court cases finding that the regulation precluded plaintiffs in Puerto Rico from utilizing the 300 day limitations period. See, e.g., Alvarez v. Delta Airlines, Inc., 319 F. Supp. 2d 240, 249 (D.P.R. 2004).

Velázquez files no reply brief responding to this argument. Nor does Velázquez's opening brief develop or even suggest any counter-argument. Our task is not to go through a record and see if a losing party may have developed an argument that it did not raise on appeal. See, e.g., Dialysis Access Ctr., LLC v. RMS Lifeline, Inc., 638 F.3d 367, 374 n.7 (1st Cir. 2011). Here, moreover, there is ample reason not to undertake such an inquiry. Velázquez's basic position, which we have accepted, is that a jury might find that Martínez sought his termination because he rebuffed her. His brief contains no argument that she was even aware that he had complained about her. Nor is there any evidence that González or Martínez first learned of any complaint by Velázquez during the period of time when González changed his mind from putting Velázquez on a performance plan for confirmed shortcomings in his performance to firing him instead.

Accordingly, while we find that Velázquez had not run out of time to claim that his firing was in retaliation for having complained about Martínez's conduct, the claim is waived as unsupported by argument or fact on appeal.

## IV. Conclusion

For the foregoing reasons, we vacate the district court's grant of summary judgment to DDR on Velázquez's discriminatory termination claim, otherwise affirm the district court, and remand to the district court for further proceedings consistent with this

opinion.  We leave it to the district court to award the costs of this appeal to Velázquez should he ultimately prevail.

So ordered.

-31-