# United States Court of Appeals
## For the First Circuit

No. 14-1086

MURAD Y. AMEEN,

Plaintiff, Appellant,

v.

AMPHENOL PRINTED CIRCUITS, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Landya B. McCafferty, U.S. District Judge]

Before

Torruella, Thompson, and Kayatta, Circuit Judges.

Lauren S. Irwin, with whom Heather M. Burns and Upton & Hatfield, LLP were on brief, for appellant.
Jonathan D. Rosenfeld, with whom Jennifer C. Brown and Wilmer Cutler Pickering Hale and Dorr LLP were on brief, for appellee.

January 26, 2015

THOMPSON, <u>**Circuit Judge**</u>. Einstein instructs that time is relative to the observer.[1] The observer in this case, defendant Amphenol Printed Circuits, Inc. (Amphenol) learned that one of its employees, plaintiff Murad Ameen, was shifting time by clocking out for lunch while still at work, and then, once back on the clock, leaving for a more leisurely lunch. A brief history of Ameen's time revealed that he had been stealing time consistently for years. Unfortunately for Ameen, in Amphenol's view, time is money. Amphenol fired Ameen, and he filed suit alleging that the basis for his termination was not theft of time, but retaliation for his having taken FMLA leave. The district court awarded summary judgment to Amphenol, a decision Ameen now appeals. Although he succeeded in saving time in a bottle for some three years, his words won't make wishes come true -- we reject his argument and affirm the district court's grant of summary judgment to Amphenol.

## I.

### BACKGROUND

#### A. Time Off

Although it is tempting to begin with "once upon a time," we must first note that the underlying facts are largely undisputed. Because the district court granted summary judgment before any fact-finder could evaluate the competing evidence and

---

[1]Einstein, Albert (1905), "Zur Elektrodynamik bewegter Körper", Annalen der Physik 322 (10): 891-921.

inferences, where accounts differ, we recount the facts in a light as favorable to Ameen as the record will reasonably allow. See McArdle v. Town of Dracut, 732 F.3d 29, 30 (1st Cir. 2013).

By the spring of 2012, Murad Ameen had worked for Amphenol (a manufacturer of printed circuit boards) and its predecessor, Teradyne, for nearly a dozen years. During that time, he received positive performance evaluations, several raises, and was promoted to the position of Group Leader. As Group Leader, in addition to operating the company's drill machines, Ameen was responsible for leading the other operators on the second shift, and assisting in planning overtime staffing to meet customer demand.

That spring, Ameen was anticipating the birth of his second child. He requested and received a two-week leave under the Family and Medical Leave Act ["FMLA"], from March 12 to March 26, as well as a one-week extension. During most of that time, Ameen worked a reduced schedule. Ameen then returned to full-time work, but declined requests to work overtime, citing his wife's poor postpartum health. Although both Ameen and Amphenol agree that overtime was not "mandatory," whether it was expected is a matter of some dispute.

On April 4, 2012, Ameen requested a personal leave of three and a half weeks, from April 26 to May 21. This was not FMLA leave, but rather, time off to accommodate a trip to his native

-3-

Iraq.[2] The next day, Ameen met with his supervisor, Joseph Silva, Operations Manager Raymond Pratt, and Director of Human Resources Valerie Hartlan to discuss his request, as Amphenol's policy requires management approval of personal leaves greater than two weeks. At the meeting, Pratt expressed concern that the timing "wasn't ideal" because it was a busy time for the company. Ameen responded that he intended to go to Iraq whether or not the company granted his request. Pratt warned Ameen that even if the company approved his leave, they could not guarantee that he would be able to retain his Group Leader position because "we may have to put somebody . . . in that position to be able to . . . lead the department." According to Silva, on a prior occasion when a Group Leader took a leave of absence, the company placed another employee in that position and moved the demoted Group Leader to another shift. At some point during the meeting, Ameen agreed that he would "help out" with overtime after his return from leave. Pratt and Silva approved Ameen's leave, and upon his return, he retained his position, salary, and benefits. Amphenol also spread out Ameen's accrued vacation time over the weeks of his leave, to ensure he could pay for his benefits.

---

[2]The purpose of the trip was to get a birth certificate for his son, and to "get his wife's maternity leave from her government job in Iraq."

## B. Time Away

In the meantime, on April 12, 2012, while working prior to the Iraq trip, Ameen failed to follow the proper procedure in setting up a job on a drill machine. Thereafter, during his lunch break, the machine stopped. When Ameen returned, he attempted to rework the job, but he failed to communicate the mechanical issues to his supervisor or anyone from the next shift, as was required by company policy. The problem continued during the next shift, resulting in lost production time.

The event was investigated and, according to Pratt, when Ameen was confronted with the results of the investigation, he "didn't hide that he made the mistake." The engineer who investigated the event brought the issue to Operations Director Christine Harrington, who concluded that Ameen had tried to "cover up" his mistake by reworking the job without reporting it. On April 16, 2012, Ameen was issued a written warning for not following proper procedure. The warning stated, "this behavior is unacceptable [and] cannot be tolerated. If this type [of] behavior continues[,] further action may be taken up to and including termination." Ameen signed the "Employee Statement" section of the warning, agreeing that he "concur[red] with the Company's statement." This was the second warning Ameen had received.[3]

---

[3]In 2009, Ameen had received a written warning for failing to follow proper procedure, resulting in "4 panels being scrapped."

-5-

## C. Time Out

Ameen returned from his personal leave in late May. Despite his earlier promise, Ameen continued to decline overtime. Pratt admits expressing disappointment over Ameen's failure to sign up for overtime as previously discussed. Ameen characterizes Pratt's response as more than disappointment. He alleges that Pratt "got mad" when he declined the overtime even though Pratt knew Ameen needed time to be with his family.

On June 22, 2012, first shift Group Leader Paul Conners reported to Pratt that two of Ameen's co-workers, Donny Moses and Mike Sullivan, accused Ameen of "cheating on his timecard." Specifically, Conners told Pratt that Ameen was "outside the department for extended periods of time." Amphenol's policy allows for a thirty-minute unpaid lunch break and a fifteen-minute paid break, for a total of forty-five minutes of break time.

Following his conversation with Conners, Pratt contacted Hartlan in Human Resources and asked her to gather Ameen's ADI timecard records, as well as the data from the company's CCure door security system that would show when Ameen had entered and exited the building. These records revealed that Ameen would punch out of the ADI system at some point every day for approximately thirty minutes, but would continue working; then, at another time, he would leave the property for approximately an hour. In this

manner, he was compensated for an additional fifteen minutes of time he did not work.

After reviewing the records, Pratt met with his supervisor, Harrington, and she directed him to investigate further. After personally observing Ameen during his shift while he clocked in and out and remained at his post, Pratt reported back to Harrington. She then reviewed Ameen's ADI and CCure records for the previous two years. The records showed that Ameen had been maintaining this practice for the entire two-year period.

Harrington decided Ameen should be fired, and she directed Pratt to draft a termination notice. Pratt wrote a first draft of the document, which referenced the ADI and CCure records and stated that Ameen's practice of leaving for an hour a day amounted to "stealing 2.5hrs a week from the company at a rate of $17.19/hr or $2,234.70/year." That Ameen was "on his cell phone throughout the shift" -- another violation of company policy -- was also noted.

Pratt then met with Ameen's supervisor, Silva, and showed him the draft. Silva told Pratt that a few years earlier, Ameen had asked if he could combine his paid fifteen-minute break and his unpaid thirty-minute lunch, so he could go home and eat with his wife. Silva gave him permission, fully knowing that Ameen would have to punch in and out for thirty minutes while still working.

However, a total of forty-five minutes was all he says he authorized.

Pratt reported to Harrington that Silva admitted giving Ameen permission to combine his two breaks; nevertheless, Harrington still determined Ameen's termination appropriate for his effectively stealing from the company by consistently taking additional paid break time. Harrington's decision to terminate also took into consideration the warning Ameen received two months prior for "covering up" his production mistake. It is undisputed that, at the time Harrington decided to fire Ameen, she did not know he had taken FMLA leave. Further, she did not know he had been declining to work overtime.

After his meeting with Harrington, Pratt revised the termination document to note that Ameen's practice of taking a "1/2 hour paid break and 1/2 hour unpaid lunch" was "not policy, [and] not approved by any [Amphenol] management." The final draft did expressly acknowledge that, while the policy deviation was not approved by senior management, Ameen had approval at the supervisor level to take a forty-five minute break by combining his fifteen minute paid and thirty minute unpaid breaks. Further, the draft stated that the extra fifteen minutes of unauthorized break time cost the company "1.25 hours of labor per week." The final version also noted Ameen's falsified timecard routine, and the April 16, 2012 written warning he had received.

-8-

## D. Time's Up

On June 27, 2012, Pratt met with Ameen to notify him of his termination, and to review the termination document with him. Pratt went over the ADI and CCure data with Ameen and explained he was being fired for stealing time from the company. Ameen refused to read or sign the termination document. Instead, he retorted, "I know this is not about ten, [fifteen] minutes. This is about you picking on me because I haven't been able to give you much overtime because of my wife's situation. I [have] been taking FMLA leave." According to Ameen, Pratt replied, "do you have proof of that?"

Ameen filed suit against Amphenol, alleging that Amphenol violated the FMLA, 29 U.S.C. §§ 2601-2619, by retaliating against him for taking family leave. Ameen claimed that his FMLA-protected activity was a motivating factor in Amphenol's decision to terminate his employment. Ameen characterized this activity as including both his formal FMLA leave, and his decision not to work overtime upon his return, which he terms "informal FMLA leave." Amphenol moved for summary judgment. After entertaining oral argument, the court granted judgment to Amphenol. In its ruling on Ameen's retaliation claim, the district court employed a four-step approach. First it "assume[d] that Ameen had carried the light burden" of proving a prima facie case of retaliation. The court then found that Amphenol had articulated a legitimate, nondiscriminatory reason for its decision to terminate Ameen. The

court next determined that, because Harrington did not know about Ameen's FMLA-protected activity, Ameen would need to invoke the cat's paw theory to impute Conners's or Pratt's animus to her as the decision-maker.  The "cat's paw theory" is employed when one "seeks to hold his employer liable for the animus of a supervisor who was not charged with making the ultimate employment decision."[4] Staub v. Proctor Hospital, 131 S. Ct. 1186, 1190 (2011).  However, the court concluded that Ameen "ha[d] produced no facts from which a reasonable jury could conclude that either Conners or Pratt acted in a way that would justify invocation of the cat's paw theory," and thus Ameen could not establish that Amphenol's reason was a pretext for retaliation under the FMLA.  The district court entered judgment in favor of Amphenol, and this timely appeal followed.

## II.

### Standard of Review

We review the district court's grant of summary judgment to Amphenol de novo, "assessing the record in the light most favorable to the nonmovant and resolving all reasonable inferences in that party's favor."  Barclays Bank PLC v. Poynter, 710 F.3d 16, 19 (1st Cir. 2013) (internal quotations omitted). Summary judgment

---

[4]With apologies to our fellow ailurophiles, we can report that the name derives from a fable in which a cunning (and hungry) monkey induces a cat by flattery to reach its paw into a fire to extract roasting chestnuts; the monkey feasts alone on the chestnuts after the cat scorches its paw. Id. at n.1.

-10-

is properly granted "where 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Id. (quoting Fed. R. Civ. P. 56(a)). "A dispute is 'genuine' if a reasonable jury, drawing favorable inferences, could resolve it in favor of the nonmoving party." Velázquez-Pérez v. Developers Diversified Realty Corp., 753 F.3d 265, 270 (1st Cir. 2014) (internal quotations omitted). "Even in employment discrimination cases where elusive concepts such as motive or intent are at issue, summary judgment is appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Benoit v. Technical Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003) (internal quotations omitted).

### III.

### Discussion

Ameen makes several arguments on appeal, the major thrust of which is that genuine issues of disputed facts exist, and summary judgment was inappropriate because the district court improperly weighed evidence and failed to draw all reasonable inferences in his favor. Ameen further challenges the standard the court employed for cat's paw liability, but argues that even assuming the standard used was correct, the district court should have denied summary judgment. We will discuss the finer points of his arguments in context.

-11-

Under the FMLA, employers are "prohibited from discriminating against employees . . . who have used FMLA leave." Hodgens v. General Dynamics Corp., 144 F.3d 151, 160 (1st Cir. 1998) (citing 29 C.F.R. § 825.220(c)). Nor may an employer "use the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." Id. (quoting 29 C.F.R. § 825.220(c)). Ameen claims his FMLA-protected activity was "a motivating factor" in his termination, and although he argues that the protected activity included both his formal leave and his refusing to work overtime, nowhere does he focus on the formal FMLA leave. Instead, he contends that attitudes toward him changed as a result of his refusing to work overtime for "FMLA-protected reasons," and that his termination was motivated by retaliation for that conduct. Because the question of whether the employer took the adverse action for a legitimate or retaliatory reason is analogous to the question of intent raised in Title VII employment-discrimination actions, we employ the framework set forth in McDonnell Douglas Corp. v. Green to analyze "the tricky issue of motivation." Id. (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 800-06 (1973)).

The McDonnell Douglas framework is a three-step procedure. First, a plaintiff employee must carry the initial burden of coming forward with sufficient evidence to establish a prima facie case of discrimination or retaliation. McDonnell

-12-

Douglas, 411 U.S. at 802. To meet this burden, Ameen must show that "(1) he availed himself of a protected right under the FMLA; (2) he was adversely affected by an employment decision; (3) there is a causal connection" between his protected activity and Amphenol's decision to terminate him. Hodgens, 144 F.3d at 161. If the plaintiff establishes a prima facie case, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason" for the termination. Id. at 160. If the employer can proffer evidence "sufficient to raise a genuine issue of fact as to whether it discriminated against the employee . . . the presumption of discrimination drops from the case, and the plaintiff retains the ultimate burden of showing that the employer's stated reason for terminating him was in fact a pretext for retaliating against him for having taken protected FMLA leave." Hodgens, 144 F.3d at 160-61 (citing McDonnell Douglas, 411 U.S. at 802, 804).

## A. Prima Facie Case

The district court assumed that Ameen established a prima facie case of retaliation, and further assumed without deciding that his protected conduct included both his FMLA leave and his decision not to work overtime after returning from his (non-FMLA) personal leave. As Ameen's claim fails for the reasons we explain below, we will take a similar tack. See Collazo-Rosado v. University of Puerto Rico, 765 F.3d 86, 92-93 (1st Cir. 2014) (noting "[t]he simplest way to decide a case is often the best,"

-13-

and assuming without deciding that the plaintiff had established a prima facie case of retaliation, before holding that she failed to present a triable issue of fact as to pretext).

## B. Legitimate Reason

Having given Ameen the benefit of a prima facie assumption, the burden shifts to Amphenol to provide a legitimate, nondiscriminatory reason for its decision to terminate Ameen. Amphenol asserts that Ameen was fired for stealing from the company by consistently taking unauthorized paid break time. The company also says it rightly considered Ameen's previous warning for failing to follow procedure.[5]

Ameen challenges Amphenol's proffered reason for the termination, but does not dispute the evidence which demonstrates that he took an additional fifteen minutes or so of paid break time consistently over a two-year period. In fact, in his brief, Ameen admits to maintaining this practice for three years, but insists he had permission to do so. Nonetheless, Ameen concedes that it was conditioned upon his making up for the extra time.[6] It is

_____

[5]Ameen does not challenge the warning he received in April, although he now characterizes it as "exaggerated" and "unusually detailed." However, he acknowledges he signed the warning and checked off the box indicating he concurred with it.

[6]On appeal, Ameen puts a spin on the notion of making up the time. He claims that he was entitled to the extra time as long as he "got his work done," irrespective of how long he remained at work. It was sufficient, he argues, if he made up "fifteen minutes of work (not time) during the day." Yet the record does not support his factual assertion. During his deposition, Ameen

undisputed that Ameen did not put in additional time to make up for the extra fifteen minutes a day.

There is no question then, that as the district court found, Amphenol had a legitimate basis to terminate Ameen; the paramount question, however, is whether the district court erred when it found Ameen had failed to raise a genuine issue of material fact as to pretext, and that Amphenol was entitled to judgment as a matter of law.

## C. Pretext

Under the McDonnell Douglas framework, the burden thus shifts back to Ameen to prove that Amphenol's stated reason was a pretext intended to disguise its retaliation for his engaging in FMLA-protected activity.[7]  To demonstrate that he was fired in retaliation for engaging in FMLA-protected conduct, Ameen "must show that the retaliator knew about [his] protected activity -- after all, one cannot have been motivated to retaliate by something he was unaware of." Medina-Rivera v. MVM, Inc., 713 F.3d 132, 139 (1st Cir. 2013).  This is where Ameen's case fails to land on its

admitted Silva conditioned the extra fifteen minutes upon Ameen's coming in early or staying late to make up the time.  It is undisputed that Ameen never made up the time by either coming in early or staying late off the clock.  We note that the ADI system tracked time to the minute, rather than the quarter hour. Amphenol's employees were paid for the time they worked, not for the amount of work they produced.  Nothing in the record permits us to conclude that Ameen was the one exception.

[7]Again, like the district court, we assume without deciding that Ameen's refusal to work overtime was FMLA-protected conduct.

feet.  It is undisputed that Harrington, who made the ultimate decision to terminate Ameen, did not know that he had taken FMLA leave, and did not know that he was declining overtime.  Ameen's only hope, then, lies in the cat's paw theory.

### 1. Cat's Paws

In invoking the cat's paw theory, Ameen attempts to prove that either Conners or Pratt were motivated by animus when they reported his timecard activities to Harrington.  In Cariglia v. Hertz Equip. Rental Corp., we held that corporate liability can attach when a neutral decisionmaker "rel[ies] on information that is manipulated by another employee who harbors illegitimate animus." 363 F.3d 77, 86-87 (1st Cir. 2004) (holding that an employee's supervisor's animus could be imputed to the decisionmaker).  Subsequently, the Supreme Court, in Staub v. Proctor Hospital, determined that cat's paw liability can attach if an employee performs an act motivated by animus that is intended to cause an adverse employment action, and if that act is a proximate cause of an adverse employment action.  131 S. Ct. 1186, 1190, 1194 (2011) (applying the Uniformed Services Employment and Reemployment Rights Act to a case involving antimilitary animus).  Both cases involved supervisors who provided false or misleading information to a decisionmaker.

Ameen argues that the district court incorrectly applied a "heightened standard" by reading Cariglia to require that the

information provided to a decisionmaker must be "inaccurate, misleading or incomplete."  Rather, Ameen contends that the Staub standard should apply, which he suggests is more liberal than Cariglia's.  According to Ameen, Staub does not require the reporting of inaccurate or misleading information; instead, all that is needed is an act by an employee (i.e. the reporting of even accurate information) motivated by animus that is intended to cause, and indeed does cause, an adverse employment action.  However, we have no need to parse these two interpretations as Ameen misses the critical point in both cases; both standards absolutely require a finding that the person who provided the information was motivated by retaliatory animus.  Accordingly, on that front, they are but two paths to the same end, taking as their first step a finding of retaliatory animus.  It is upon that step that Ameen's claim trips.

## 2. Animus Claims Against Conners

To prevail in his claim, Ameen must establish that Amphenol's reason for terminating him was a pretext for retaliatory animus.  Ameen contends that the district court overlooked evidence that would establish that the employees who reported the information about his break time to the ultimate decisionmaker were motivated by animus.  Beginning with first shift Group Leader Conners, Ameen argues that Conners's very reporting to Pratt (Operations Manager) the information he received from Moses and

-17-

Sullivan (Ameen's co-workers and subordinates) about Ameen's extended breaks is proof of retaliatory animus because of how differently Conners dealt with his own subordinates on this issue. Ameen argues that when Conners's subordinates took additional break time, he only chastised them for doing so, but never otherwise disciplined them, nor reported them to higher-ups. On this point, Conners's unrebutted deposition testimony established that when a member of his crew was "five minutes late" returning from break, he spoke to them about it and received the assurance that "it won't happen again." Had the behavior been repeated, Conners stated that he would have "elevate[d] that to the supervisor." Ameen points to no other similarly-situated employee who consistently took an extra fifteen minutes off every day as he did who received more favorable treatment from Conners. Given these facts, Conners's mere reporting of Ameen up the corporate food chain is insufficient to demonstrate animus.[8]

Ameen also posits, in support of his animus claim, that Conners was "hostile" towards him because Conners was "frustrated" about having to work overtime due to Ameen's no-overtime schedule.

_____

[8]After this lawsuit was filed, Amphenol took note of Ameen's allegation that "[o]ther employees in [his] department followed the same practice," and conducted an investigation. The ADI and CCure records showed that from January 2012 to June 2012, the co-tipster Donny Moses had been clocking out while remaining at work, then leaving for an hour. Like Ameen, Moses was then terminated. There is no evidence that Amphenol knew of this practice before Sullivan -- and ironically, Moses -- brought Ameen's conduct to Conners's attention.

-18-

Other than pointing to Conners having reported Ameen's extended breaks to superiors, Ameen gives us no other explanation or evidence of this hostility. Conners denied any display of frustration, and stated that he reported the information to Pratt because, as a twenty-five year employee, "I wouldn't cheat on my time, and I don't expect other people to do that. That's stealing." Regardless of Ameen's opinion on what may have motivated Conners to report his extended break times, his "subjective belief in retaliation is not enough" to show animus on Conners's part, and no objective evidence in the record supports his animus theory. Roman v. Potter, 604 F.3d 34, 41 (1st Cir. 2010).

### 3. Animus Claims Against Pratt

Alternatively, Ameen describes a number of ways in which Pratt's behavior demonstrates animus. First, and identical to his Conners argument, he says that because Pratt had never before escalated the issue of extended breaks to Harrington when dealing with allegedly similarly-situated employees, the fact that he elevated the issue of Ameen's break time to Harrington is proof sufficient to infer animus. In rebuttal, Amphenol repeats it had never before encountered a case in which an employee had consistently combined two breaks and then took an additional unauthorized quarter hour on top of that. Nothing in the record contradicts this assertion.

-19-

Moreover, Pratt did not just pass along the tip after receiving it; he conducted his own investigation by requesting and reviewing Ameen's ADI and CCure records for the previous month; and only when he had satisfied himself that the alleged practice was actually occurring did he bring the matter to Harrington. The mere fact of an investigation -- particularly one spurred by a violation of company policy -- is not proof of animus and nothing else in the record suggests that the investigation was motivated by animus. It bears repeating that "[e]ven in employment discrimination cases where elusive concepts such as motive or intent are at issue, summary judgment is appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Benoit, 331 F.3d at 173 (internal quotations omitted). The record before us does not support Ameen's allegations.

Second, and grasping for straws, Ameen contends in support of his animus claim that Pratt misled Harrington about the warning Ameen had received in April, leading her to believe that a "cover up" occurred. Specifically, Ameen states that he "was not asked about the error on the night in question, and clearly admitted the mistake to Pratt when asked, and therefore Pratt acknowledged that there was no effort to cover up the mistake." The record, however, makes plain that Ameen is playing cat and mouse with the facts. That he was not asked about the error on the

night in question is irrelevant if clear company protocol required that he relay that information when "tying off" with the next shift. Harrington stated that she reached her own independent conclusion that Ameen "tried to cover up a scrap event" when the investigating engineer "was able to show that the panel had been drilled twice, the first time with an incorrect setup, the second time to fix the problem that had been created by the first issue." It was that action, of covering up a work mistake and not following reporting procedure, to which Harrington referred. That Ameen admitted to the mistake once confronted with it by Pratt is beside the point. There is no evidence that Pratt misled Harrington about the nature of the event, and no evidence that his reporting the information was motivated by animus.

Third, Ameen next cites as proof of animus that Pratt both "withheld" from Harrington the fact that he "had permission to misuse the timeclock system," and failed to apprise Harrington of Ameen's earlier FMLA leave. Harrington made clear, however, without contradiction, that it was Ameen's taking of an additional fifteen minutes of time each day -- not the use of the time clock system per se -- that she viewed as terminable misconduct. As for not sharing with Harrington Ameen's FMLA schedule, he does not explain why Pratt should have done so, nor does he tell us why not doing so demonstrates animus.

Lastly, in support of his Pratt animus argument, Ameen claims that Pratt was angry that he wouldn't work overtime. However, Ameen does not tell us the basis for this impression, and does not recount specific words or any particular behavior that would indicate anger. He offers us only a conclusory allegation. Further, he says that both Pratt and Conners "had shown hostility toward [his] FMLA-protected activity," and that Pratt's attitude toward him changed after he returned from FMLA leave. Ameen directs us to only one specific example of so-called hostile conduct -- his inclusion, according to Silva, on Pratt's purported "I don't like" list.[9] However, even assuming the existence of such a list, there is no evidence to tie it to Ameen's FMLA-protected conduct. Similarly, there is nothing to connect Ameen's general and vague allegations of hostility by Pratt to Ameen's FMLA-protected activity, if any, rather than to his unauthorized breaks. "[A]lthough an employee who properly takes FMLA leave cannot be discharged for exercising a right provided by the statute, [he] nevertheless can be discharged for independent reasons." Henry v. United Bank, 686 F.3d 50, 55 (1st Cir. 2012).

Moreover, we note that evidence in the record completely contradicts Ameen's assertion of animus on Pratt's part. During

_____

[9]Although Ameen claims that Silva told him about Pratt's supposed list, there is no deposition testimony in the record from either Silva or Pratt about any list. How Ameen's account could be admissible evidence is beyond us.

this period of claimed anger and hostility, Pratt agreed to allow Ameen to take over three weeks of personal leave shortly after his FMLA leave, when he had the discretion to refuse; and Pratt allowed it despite Ameen's statement that he would go whether or not the personal leave was approved.  If Pratt were looking for a reason to get rid of Ameen for exercising his FMLA rights, he could have simply denied the personal leave and fired Ameen if he went anyway.  Instead, Amphenol "spread out" Ameen's vacation days over the course of the leave, so that his benefits would be covered.

## CONCLUSION

As stated earlier, Ameen has the burden of proving that Amphenol's stated reason for his termination was a pretext, and because Amphenol proffered a legitimate basis for terminating Ameen, he must do so "without the benefit of the animus presumption."[10]  Id. at 56. To prove pretext, he had to establish the existence of retaliatory animus on the part of either the decisionmaker, or the employee who purportedly manipulated the decisionmaker into acting as his "cat's paw."  Once the presumption of animus creeps out, Ameen cannot clear this initial step.  Ameen has not offered evidence of retaliatory animus on anyone's part

---

[10]Nevertheless, Ameen claims that because he "satisfied the causation requirement for [his] prima facie case," his proffered evidence of pretext should be sufficient to defeat summary judgment.  It is not.  Although we assumed Ameen established a prima facie case, once Amphenol articulated a legitimate, nondiscriminatory reason for the termination, there was no basis to carry that assumption forward into the pretext analysis.

-23-

sufficient to raise a disputed question of fact, or to defeat Amphenol's right to judgment as a matter of law. Absent retaliatory animus, there can be no pretext. Our de novo review reveals that Ameen's cat's paw theory is effectively declawed. Accordingly, we affirm the district court's entry of summary judgment. Each side shall bear its own costs in this appeal.

**- Concurring Opinion Follows -**

**KAYATTA, <u>Circuit Judge</u>, concurring**.

I concur in affirming the judgment of the district court dismissing the complaint, albeit for a reason the majority does not reach. No party disputes that Operations Director Christine Harrington was the person who in both form and substance decided to fire the plaintiff. Ameen does not point to any evidence suggesting that, having independently confirmed that Ameen did commit the serious misconduct with which he was charged, Harrington either herself had any improper motive, or that she knew or reasonably should have known that Pratt had an improper motive. Therefore, even if we accept that Ameen has enough evidence to support a finding that Pratt was motivated to seek his discharge for reasons other than the conduct reviewed by Harrington, there would still be no basis for holding his employer vicariously liable. <u>Cf.</u> <u>Vélazquez-Pérez</u> v. <u>Developers Diversified Realty Corp.</u>, 753 F.3d 265, 274 (1st Cir. 2014) (holding that an employer can be held liable for a co-worker's discrimination under Title VII if, among other things, the employer "knows or reasonably should know" of the discrimination) (parentheses omitted).