# United States Court of Appeals
## For the First Circuit

No. 11-2419

ESTRELLA MEDINA-RIVERA; OMAR CAJIGAS-QUIÑONES;
CONJUGAL PARTNERSHIP CAJIGAS-MEDINA

Plaintiffs, Appellants,

v.

MVM, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Daniel R. Domínguez, U.S. District Judge]
[Hon. Marcos E. López, U.S. Magistrate Judge]

Before

Torruella, Lipez, and Thompson,
Circuit Judges.

Eugenio W.A. Géigel-Simounet, with whom Géigel-Simounet Law
Offices C.S.P. was on brief, for appellants.
Shiara L. Diloné Fernández, with whom Anabel Rodríguez-Alonso
and Schuster Aguiló LLP were on brief, for appellee.

April 10, 2013

**THOMPSON, <u>Circuit Judge</u>**.

## Setting the Stage

Estrella Medina-Rivera (Medina) appeals from a summary judgment dismissing her Title VII case against MVM, Inc. Medina's husband Omar Cajigas-Quiñones (Cajigas) and their conjugal partnership also appear as plaintiffs and appellants. Their rights, however, derive from hers, so we can ignore them for now and treat her as if she were the only plaintiff-appellant – though our decision is binding on all parties, naturally. Medina offers a number of reasons why the summary-judgment ruling cannot stand. Exercising <u>de novo</u> review, <u>Soto-Padró</u> v. <u>Pub. Bldgs. Auth.</u>, 675 F.3d 1, 5 (1st Cir. 2012), we conclude that none persuades. But before getting into all that, we summarize the key facts as favorably to Medina as the record will allow, <u>id.</u> at 2, keenly aware that we cannot accept "conclusory allegations, improbable inferences, and unsupported speculation," <u>Medina-Muñoz</u> v. <u>R.J. Reynolds Tobacco Co.</u>, 896 F.2d 5, 8 (1st Cir. 1990); <u>accord</u> <u>Ahern</u> v. <u>Shinseki</u>, 629 F.3d 49, 54 (1st Cir. 2010).

In January 2008 Medina took a job as a part-time, on-call detention officer with MVM, a private firm that provides security services (<u>e.g.</u>, unarmed guards and other personnel) on a contract basis to the Bureau of Immigration and Customs Enforcement (ICE), among others. Having no set schedule, Medina worked when and as needed (mornings, afternoons, or evenings), filling in for full-

time detention officers who could not make their shifts. Sometimes she worked only one day a week, probably because MVM used a seniority system for doling out work to part-time detention officers, and she was near the bottom of the seniority list – roughly 16 out of the 20 or so persons in her position had more seniority than she. Also affecting her work hours was the fact that she started taking afternoon classes at the University of Puerto Rico in August 2008.

Medina and her MVM colleagues worked with ICE agents, but she and her MVM co-workers were supervised by MVM, not by ICE. Anyway, sometime before late October 2008 (oddly, the record does not say exactly when), Medina told one of her supervisors, Rubén Velázquez Ferrer (Velázquez), that an ICE agent – she did not say who – had gotten her phone number off a list posted at an ICE control room and was "bothering" her with calls. "Bothering," that is the word she used in her deposition, though she later used "harassing" in her post-deposition affidavit. Hoping to end the calls, Medina asked Velázquez to take her number off the list. Velázquez said that he could not do that ("I can't take that out," Medina quoted Velázquez as saying) because MVM and ICE rules required that detention officers' phone numbers be kept in that room. But "don't worry," he added, because he would run this by one of his bosses, Elba Navarro Calderón (Navarro). MVM insists that no such conversation occurred between the two. But we must

resolve any genuinely disputed facts in Medina's favor. See Galloza v. Foy, 389 F.3d 26, 28 (1st Cir. 2004).

Fast forward to October 23, 2008. Medina and detention officer Isabel Orengo Muñiz (Orengo) were guarding a female detainee and her daughter at a hotel. ICE agent Ramón Ortiz showed up, tasked with taking the mother and daughter to a hospital for x-rays. Becoming visibly nervous, Medina turned to Orengo and asked "why him?" Orengo then escorted the mother and daughter to the transport van, at Ortiz's request. Alone with Medina in the hotel room, Ortiz grabbed her and started kissing her against her will. He touched her all over. She tried to push him off her but could not. He stopped when Orengo got back.

The next day, Medina told Navarro about her frightening encounter with Ortiz. She also revealed for the first time that before this incident Ortiz would sometimes move very close to her, tell her she "smelled good," and try to hug her. This, apparently, had been going on for months. Navarro spoke up, saying that when Velázquez had talked to her about the harassing-phone-call situation, she suspected that Ortiz might have been the caller. Navarro denies saying this, we are told. Again, though, at this stage of the lawsuit all reasonable doubts must be resolved against MVM. See id.

Springing into action, Navarro passed Medina's complaints through MVM's administrative channels that very day. Word came

back that Ortiz was to keep away from Medina.  On October 27, Medina told an MVM manager that she was afraid to return to work, particularly since Ortiz was a gun-carrying ICE agent.  Medina then took a three-day "bereavement leave."  A little later (by October 31), Ortiz was gone, transferred to a different office in a different city.

As part of the contract between MVM and ICE, all detention officers had to complete a 40-hour refresher training course, one part of which involved a training seminar on sexual harassment.  MVM's Julio Pizarro Andino (Pizarro) ran the program.  During a seminar in December 2008, Pizarro zeroed in on Medina and asked her to define sexual harassment.  A nervous and embarrassed Medina did not want to answer.  But Pizarro kept at her, demanding to know her definition.  Sensing her anxiety, a co-worker tried to answer for her.  "Is your name Estrella Medina?" Pizarro asked him sarcastically.  When Medina started to cry, another colleague attempted to define the term.  "Is your name Estrella Medina?" Pizarro shot back.  Finally Medina exclaimed, "sexual harassment was when one person forces another to sexually humiliate another against her will," like Pizarro had "just done."

After exhausting her administrative remedies, Medina, together with her husband and their conjugal partnership, sued MVM under Title VII, 42 U.S.C. § 2000e et seq., alleging sex discrimination in the form of hostile-work-environment harassment,

-5-

plus retaliation for challenging the harassment.[1]  MVM eventually moved for summary judgment on all claims, and a magistrate judge recommended that the motion be granted.  Over Medina's objections, a district judge accepted the recommendation and entered judgment accordingly.  And it is this judgment that Medina now appeals to us.

### A Summary-Judgment Primer

Because plenty of cases spell out the summary-judgment standard in splendid detail, see, e.g., Rockwood v. SKF USA Inc., 687 F.3d 1, 9 (1st Cir. 2012), we just hit the highlights (repeating some of what we said above).  Giving a fresh look to the judge's ruling, we resolve doubts and draw reasonable inferences in Medina's favor.  See, e.g., Stop & Shop Supermarket Co. v. Blue Cross & Blue Shield of R.I., 373 F.3d 57, 61 (1st Cir. 2004); Casas Office Machs., Inc. v. Mita Copystar Am., Inc., 42 F.3d 668, 684 (1st Cir. 1994).  But Medina cannot rely on speculation to avoid summary judgment.  See Ahern, 629 F.3d at 58; Medina-Muñoz, 896 F.2d at 8.  And we need not accept her version of events if it is "blatantly contradicted" by the evidence.  See Scott v. Harris, 550 U.S. 372, 380 (2007); accord Statchen v. Palmer, 623 F.3d 15, 18 (1st Cir. 2010) (emphasizing that "incredible assertions" by the nonmoving party "need not be accepted").  In the end, we will

_____

[1] Medina sued other defendants too but later voluntarily dismissed her claims against them.

affirm the grant of summary judgment if (but only if) the record evidence (depositions, sworn statements, admissions, etc.) reveals "that there is no genuine dispute as to any material fact" and that MVM "is entitled to judgment as a matter of law," see Fed. R. Civ. P. 56(a), (c) – which is a fancy way of saying that no reasonable jury could find for Medina, see Farmers Ins. Exch. v. RNK, Inc., 632 F.3d 777, 784 (1st Cir. 2011).

With this backdrop in place, we turn to the particulars of this case, laying out more facts as needed.

**Analyzing the Issues**

This appeal turns principally on issues of federal employment-discrimination law, which is a complex and evolving area. See Rodríguez-Machado v. Shinseki, 700 F.3d 48, 49 (1st Cir. 2012) (per curiam). We can, however, simplify things a bit by focusing only on what is necessary to decide this dispute. And that is what we will do.

(a)
Sex Discrimination

Title VII prohibits, among other things, sex-based discrimination that changes the terms or conditions of employment. See 42 U.S.C. § 2000e-2(a)(1). And sexual harassment is a form of sex discrimination, the Supreme Court tells us – by committing or tolerating sexual harassment against an employee, an employer has effectively altered the terms or conditions of the victim's job. See, e.g., Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 751-54

(1998).  One type of sexual harassment – the kind Medina alleges –
involves "bothersome attentions or sexual remarks" so "severe or
pervasive" that they create a "hostile work environment."[2]  Id. at
751.  Accused-harasser Ortiz was not an MVM employee like Medina.
But because, as we have just said, employers must provide their
personnel with a harassment-free workplace, they may be on the hook
for a nonemployee's sexually-harassing behavior under certain
conditions – one of which being that they knew or should have known
about the harassment and yet failed to take prompt steps to stop
it.  See, e.g., Rodríguez-Hernández v. Miranda-Vélez, 132 F.3d 848,
854-55 (1st Cir. 1998); see also Lockard v. Pizza Hut, Inc., 162
F.3d 1062, 1072-74 (10th Cir. 1998) (collecting cases, including
Rodríguez-Hernández); 3 Lex K. Larson, Employment Discrimination §
46.07[4] (2d ed. 2011) (discussing, among other things, 29 C.F.R.
§ 1604.11(e), an EEOC guideline dealing with the known-or-should-
have-known standard).

Medina's argument is straightforward enough.  She does
not fault MVM's response after she complained about Ortiz's assault

---

[2] Generally, the key elements of a hostile-work-environment
claim are these:  (1) the plaintiff belongs to a protected group;
(2) she was subject to unwelcome sexual harassment; (3) the
harassment was based on her sex; (4) the harassment was
sufficiently severe or pervasive to alter the conditions of
employment and create a discriminatorily-abusive work environment;
(5) the complained-of conduct was both objectively and subjectively
offensive; and (6) there is a basis for employer liability.  See,
e.g., Gerald v. Univ. of P.R., 707 F.3d 7, ___ (1st Cir. 2013);
Pérez-Cordero v. Wal-Mart P.R., Inc., 656 F.3d 19, 27 (1st Cir.
2011).

– after all, Ortiz was gone within days of the incident. Rather she protests the way MVM handled things after she mentioned the harassing calls. Distilled to its essence, her argument goes something like this. Before the assault, she had clued in MVM's Velázquez on how some unnamed ICE agent was "bothering" or "harassing" her over the phone.[3] That agent, she tells us, called her a hundred times or so, which, she intimates, satisfies the severity-or-pervasiveness requirement. Yet MVM did nothing about that, even though MVM's Navarro admitted after the assault that she suspected Ortiz was the harasser, and MVM's do-nothing approach following her conversation with Velázquez led to Ortiz's sexually assaulting her at the hotel and Pizarro's humiliating her at the seminar. Or so her argument concludes.

Actually, though, a scan of the record shows that Medina did not tell Velázquez about a hundred-plus calls. She came up with that number after the assault. And even then she basically admitted that she only knew for sure that he had called her two times. Here is how that came about. Answering the first call and hearing Ortiz identify himself, Medina told him "don't ever call me again," and then she hung up on him. Cajigas, her husband,

---

[3] MVM has a written policy that prohibits sex-based harassment, "encourage[s]" workers to tell their supervisors or the human resources director if they have experienced this type of harassment or "have witnessed such behavior," and explains how MVM "determines how allegations are investigated . . . ." Medina received a copy of the policy.

answered the second call. "Yes, good day, is Estrella in?" Ortiz asked. "Look she's not in," Cajigas said. "Oh, well," Ortiz responded, "[t]ell her that agent Ortiz called her." "Okay," Cajigas replied. And then Ortiz hung up. Neither Medina nor Cajigas answered the other calls. But her caller ID showed that the calls came from the same number. It turns out that that number is an ICE work number, not Ortiz's personal number. Yet she suggests that every call was from Ortiz, even though someone could have been calling her on that line for work-related reasons – remember, Medina was an on-call employee who worked when called. Her suggestion is nothing more than the sheerest speculation, which is entitled to no weight in the summary-judgment analysis. See, e.g., Ahern, 629 F.3d at 54; Medina-Muñoz, 896 F.2d at 8; see also Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 743 (1st Cir. 1995) (noting that "[w]hile the summary judgment mantra requires us to draw every reasonable inference in favor of the nonmoving party, inferences, to qualify, must flow rationally from the underlying facts," i.e., "a suggested inference must ascend to what common sense and human experience indicates is an acceptable level of probability").

Even putting that flaw aside, the difficulty for Medina is that Title VII does not ban harassment alone, no matter how severe or pervasive – no, as relevant here, that statute bans sexual harassment. See Higgins v. New Balance Athletic Shoe, Inc.,

-10-

194 F.3d 252, 258 (1st Cir. 1999). "Harassing" and "harassment" have different meanings in different contexts, broadly covering situations involving words and actions "that, being directed at a specific person, annoy[], alarm[], or cause[] substantial emotional distress in that person and serve[] no legitimate purpose" – like when a "creditor uses threatening or abusive tactics to collect a debt." Black's Law Dictionary 784 (9th ed. 2009). Yet nothing Medina said during her initial meeting with Velázquez indicated that an ICE agent was harassing her sexually.[4] Of course we are not suggesting that she had to throw around buzzwords like "sex" or "sexual" harassment. We say only that she had to say something to put MVM on notice that the complained-of harassment was sex-based. For example, this might be a different case if, in addition to mentioning the "harassing" calls, Medina also told Velázquez about her other complaints – i.e., how for months that same agent would get up close to her, tell her she "smelled good," and try to hug her. But again, she did not do that. The first time that she brought that stuff up was in her post-assault meeting with Navarro. As for why, she says that she stayed quiet until then because she feared being fired, though she presents nothing indicating that her

_____

[4] Just so there is no confusion, we repeat previous reminders to the bar and bench that the harassing action need not be inspired "by sexual desire" to be redressable under Title VII – the only requirement is that the action must be because of the victim's sex. Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998); accord Pérez-Cordero, 656 F.3d at 28; O'Rourke v. City of Providence, 235 F.3d 713, 729 (1st Cir. 2001).

fear was credible.  See generally Reed v. MBNA Mktg. Sys., Inc.,
333 F.3d 27, 35-36 (1st Cir. 2003) (holding that a vague fear of
adverse consequences is not a sufficient basis for keeping quiet).

And while we are talking about Navarro, Medina makes much
of Navarro's guessing that Ortiz was the phone-call harasser – a
guess that should have caused Navarro to investigate the situation,
which, the theory goes, would have prevented the assault.  But
there is nothing suggesting Navarro knew that Ortiz was harassing
Medina over the phone because of her sex.  Recall how after Medina
told Velázquez about the harassing calls (a conversation that took
place before the assault), Velázquez shared this information with
Navarro, who was his higher-up in the MVM chain of command.  Well,
again, nothing Medina said indicated that the phone-call harassment
was gender-based.  Also, Medina directs us to nothing suggesting
that Navarro knew, say, that Ortiz had a history of sexual
harassment, which might have triggered a duty to investigate here.
Consequently, this argument does not help her position.

The upshot is that Medina paints an ugly picture of what
Ortiz did to her during her MVM tenure.  Yet even assuming she has
sketched events accurately, "hard as our sympathies may pull us,
our duty to maintain the integrity of the substantive law pulls
harder."  Turner v. Atl. Coast Line R.R. Co., 292 F.2d 586, 589
(5th Cir. 1961) (Wisdom, J.).  And ultimately, she has no sex-

discrimination claim against MVM, so we affirm the summary judgment on that claim.

(b)<br>Retaliation

Whether or not MVM discriminated against her on the basis of sex, Medina insists that it infracted Title VII by retaliating against her for alleging that it did.  See 42 U.S.C. § 2000e-3(a) (Title VII's anti-retaliation provision).  To succeed on a retaliation claim, a plaintiff must first prove these elements: One, she undertook protected conduct.  See, e.g., Ahern, 629 F.3d at 55.  Two, her employer took a material adverse action against her – i.e., action that could deter a "'reasonable'" employee from complaining about the discrimination.  Id. (quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 57 (2006)).  Requiring that level of adversity helps "to separate significant from trivial harms," with "petty slights, minor annoyances, and simple lack of good manners" falling in the "trivial" category.  Burlington N., 548 U.S. at 68.  And finally, three, a causal nexus exists between elements one and two.  Ahern, 629 F.3d at 55.  Obviously too, the employee must show that the retaliator knew about her protected activity – after all, one cannot have been motivated to retaliate by something he was unaware of.  See Lewis v. Gillette, Co., 22 F.3d 22, 24-25 (1st Cir. 1994) (per curiam) (indicating that awareness may be shown by circumstantial evidence); see also Alvarado v. Donahoe, 687 F.3d 453, 458-59 (1st Cir. 2012) (similar,

-13-

and discussing too the burden-shifting process that begins once plaintiff proves a prima-facie case).

Neither side disputes that Medina engaged in protected conduct when she told MVM about how Ortiz had sexually assaulted her. So we now determine whether the evidence, viewed through the standard summary-judgment prism, can support a finding that she suffered a materially adverse action causally connected to her protected activity. She thinks it does, making a number of arguments that boil down to this: After she named Ortiz as her assaulter, MVM, she says, (a) suspended her almost immediately, from October 24 (the day she told Navarro about the terrifying hotel incident) until November 15;[5] then (b) "severely" cut her work hours; and later (c) humiliated her during the sexual-harassment seminar. We discuss these points one by one.

As support for her suspension charge, Medina relies on her say-so, basically. Take, for example, her deposition, where she flatly denied working during the alleged suspension term. "Not even one hour?" counsel asked. "Nothing," she said. She also relies on her MVM earning statements, which, she intimates, show a gap reflecting the alleged suspension period. A couple of things make her argument a nonstarter, however. For openers, she later

---

[5] For simplicity's sake, we sometimes refer to this as the alleged or supposed suspension period or term.

admitted in her opposing statement of material facts[6] that she had indeed "worked during the three weeks following the incident with Ortiz" – i.e., during the supposed suspension term. On top of that, earning statements provided by MVM show that, yes, she had worked during that period – something that she also admitted in her opposing statement of material facts. And as we just said a moment ago, we cannot accept a party's version of the facts when it is "blatantly contradicted by the record, so that no reasonable jury could believe it," see Scott, 550 U.S. at 380, which is exactly our situation. Clearly, then, Medina has not met the materially-adverse action requirement here.

Nor does she do any better in arguing that MVM slashed her work hours after she accused Ortiz of sexual assault. What trips her up here is that she does not support her rhetoric with hard proof. Looking to defeat summary judgment, she told the court below that one cannot tell from MVM's records "how many hours [she] worked before she reported the sexual assault" – meaning (her argument continued) that "the hours she worked before the assault cannot be compared [with] the hours she worked after she reported the assault." And she says nothing different here. We do not understand how she can take that tack, however. The summary-

_____

[6] See D.P.R. Civ. R. 56(c) (directing a party opposing summary judgment to submit with her opposition papers "a separate, short, and concise statement of material facts" admitting, denying, or qualifying the material facts highlighted by the moving party).

judgment record clearly shows the hours she worked before and after the assault.  The record also shows how she had no set hours to begin with (she worked on an as-needed basis), and her hours fluctuated because of her lack of seniority and her class schedule. Anyway, her severe-work-reduction charge amounts to no more than conclusory speculation, which cannot block summary judgment.  See, e.g., Ahern, 629 F.3d at 54; Medina-Muñoz, 896 F.2d at 8.  In other words, this argument like the first fails.

Medina's third argument – that Pizarro badgered her into defining what sexual harassment means as payback for her complaining to MVM over a month earlier about Ortiz's sexual assault on her – falters too, for a simple reason.  Let's assume without deciding that Pizarro's bullying words were more than just "petty slights, minor annoyances," or a "simple lack of good manners," but actually rose to the level of material adversity required by the caselaw.  See Burlington N., 548 U.S. at 68.  That would take her only so far.  She still must show that Pizarro knew about her protected activity.  See, e.g., Alvarado, 687 F.3d at 458-59; Lewis, 22 F.3d at 24-25.  This she has not done.  Pizarro said in his affidavit that he "had absolutely no knowledge about the sexual harassment claim" that Medina had lodged against Ortiz. Also, Medina conceded below that she had "no personal knowledge" of what information Pizarro had regarding the sexual-harassment charge she had leveled against Ortiz.  And she points us to no evidence

-16-

from which we can infer that Pizarro had any clue as to what she had told MVM concerning her horrifying run-in with Ortiz back at the hotel. She "imagine[s]" that Pizarro had to have known about this, given that "he is an MVM employee." But she cannot deflect summary judgment with pure speculation like that. See, e.g., Ahern, 629 F.3d at 54; Medina-Muñoz, 896 F.2d at 8.

The bottom line is that Medina cannot dodge summary judgment on her retaliation claim. And so we move on.

(c)
Cajigas's Claims

Medina and her husband Cajigas criticize the judge for dismissing his claims. To their way of thinking, Cajigas's claims were not, as the judge believed, entirely derivative of hers. But their argument is not fully developed, lacking any citation to supporting authority (or even a persuasive explanation of what the law should be, assuming they found no authority). And "developing a sustained argument out of . . . legal precedents" is appellant's job, not ours. Town of Norwood v. Fed. Energy Regulatory Comm'n, 202 F.3d 392, 405 (1st Cir. 2000). The issue is waived. See id.; see also Muñiz v. Rovira, 373 F.3d 1, 8 (1st Cir. 2004) (holding as waived an argument presented "to us in skeletal form, without citation to any pertinent authority").

(d)
<u>A Parting Shot</u>

One last thing.  Discussing Puerto Rico Rule of Civil Procedure 36, Medina tells us that Commonwealth courts can only grant summary judgment in clear-cut cases – a policy, she insists, that federal courts must follow too.  And building to the ultimate crescendo, she faults the judge for not doing that here.  We are unpersuaded.

For starters, Medina offers us no assurance that she properly preserved this policy point below.  And nowhere in her papers opposing summary judgment or objecting to the magistrate judge's report does she float this policy theory – actually, she cited caselaw applying the <u>federal</u> summary-judgment standard.  This is no small matter, since theories not squarely presented below typically cannot be advanced here.  <u>See</u> <u>Brown</u> v. <u>Colegio de Abogados de P.R.</u>, 613 F.3d 44, 50 (1st Cir. 2010); <u>Teamsters, Chauffeurs, Warehousemen & Helpers Union, Local No. 59</u> v. <u>Superline Transp. Co.</u>, 953 F.2d 17, 21 (1st Cir. 1992).

But even ignoring that problem, her thesis runs headlong into precedent.  "Whether or not a case rests on diversity jurisdiction," we wrote 20 years ago, "the summary judgment standard is a matter of federal law, for it is settled that, broadly speaking, in a federal court federal law determines the respective roles of trial judge, jury, and reviewing court."  <u>Villarini-García</u> v. <u>Hosp. del Maestro, Inc.</u>, 8 F.3d 81, 86 (1st

-18-

Cir. 1993). <u>Villarini-García</u> cited a number of cases, including <u>McEwen</u> v. <u>Delta Air Lines, Inc.</u>, which stressed that "[f]ederal courts may grant summary judgment under Rule 56 on concluding that no reasonable jury could return a verdict" for the nonmoving party, "even if" state law "would require the judge to submit an identical case to the jury." 919 F.2d 58, 60 (7th Cir. 1990); <u>see also</u> <u>Fid. Nat'l Title Ins. Co. of N.Y.</u> v. <u>Intercounty Nat'l Title Ins. Co.</u>, 412 F.3d 745, 750 (7th Cir. 2005) (Posner, J.) (declaring that "[t]he Federal Rules of Civil Procedure, not state procedural rules, govern in . . . federal-question" suits "in federal district courts," just as they do in diversity suits); <u>Hayes</u> v. <u>Equitable Energy Res. Co.</u>, 266 F.3d 560, 566 (6th Cir. 2001) (same); 12 James Wm. Moore <u>et al.</u>, <u>Moore's Federal Practice</u> § 59.03, at 59-9 (3d ed. 2012) (ditto).

Any way we look at it, then, Medina's claim that the judge was "bound" by Puerto Rico's summary-judgment policy is not a winning one. And that is that.

### Final Words

Our work over, we **<u>affirm</u>** the judgment below in all respects. Also, we think it fitting that the parties bear their own costs on appeal.

**<u>So Ordered</u>**.