# United States Court of Appeals
## For the First Circuit

No. 19-1174

CHRISTOPHER O. BRANDT,

Plaintiff, Appellant,

v.

JOSEPH FITZPATRICK, in his official capacity as the Commissioner
of the Maine Department of Corrections; SCOTT LANDRY,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. Nancy Torresen, U.S. District Judge]

Before

Howard, Chief Judge,
Torruella and Thompson, Circuit Judges.

Cynthia A. Dill for appellant.
Kelly L. Morrell, Assistant Attorney General, with whom Aaron
M. Frey, Attorney General, and Susan P. Herman, Deputy Attorney
General, were on brief, for appellees.

April 22, 2020

**THOMPSON**, **Circuit Judge.** Corrections Officer Christopher O. Brandt left his job at the Maine Department of Corrections ("MDOC") for a spot in the federal prison system. When the federal job didn't work out, Brandt reapplied for his old job, but MDOC wouldn't take him back. He sued MDOC for race discrimination and retaliation, but he lost. He now appeals the district court's grant of summary judgment against him. In a nutshell, since he lacked the proof needed to reach trial, we affirm.

## I. BACKGROUND[1]

Brandt is a navy veteran who's spent most of his career providing security for the federal government, including seven years as a corrections officer in New York and seven as a special agent at the Department of State. Then, he moved to Maine. From late 2012 through January 2014, he worked for the MDOC as a state corrections officer at the Maine Correctional Center ("MCC") in Windham. But Brandt's sights were trained elsewhere; throughout his two-year stint as a state prison guard, he applied every few months to positions on MDOC's "probation side" — to be a probation officer or probation officer assistant. If he'd gotten the job, Brandt would have been MDOC's only African American probation

---

[1] In laying out the facts, we view the evidence from Brandt's perspective, drawing all reasonable inferences in his favor. See Robinson v. Town of Marshfield, 950 F.3d 21, 24 (1st Cir. 2020).

officer.  But he had no such success.  Brandt met the minimum qualifications and interviewed for each open spot,[2] but the probation-side brass turned him down each time.

Defendant Scott Landry was among the deciders.  At the time, he was the administrator in charge of MDOC region 2.  Along with two other panelists, Landry interviewed Brandt for two probation officer slots in January 2013.  But, concerned that Brandt described himself as a rigid "black and white" thinker (since probation officers often face complex human situations requiring creative thinking) and had no experience as a probation officer (meaning he'd need "close supervision and support" as he began the job), they picked two other (non-black) candidates, a former federal probation officer and an MDOC probation officer assistant, instead.

That spring (on April 12, 2013), Brandt wrote Joseph Ponte, then Commissioner of the MDOC (and not a party here), to express concerns about the MDOC hiring process.  The letter began:

> Dear Commissioner Ponte:
>
> I am writing to praise you for breaking-up the, "good ole boy network" in the prisons and applaud your efforts in embracing diversity, in the Great State of Maine, by seeking qualified applicants that truly reflect the multi-cultural communities we serve.  I am a Black male with over 15 years experience in Federal law enforcement, which includes

---

[2] At the time, MDOC gave interviews to internal applicants like Brandt if they met the minimum qualifications for the open position.

investigations and I possess a Masters degree.  I currently work at the [MCC] as a Correction Officer. I truly enjoy working at MCC and for the [MDOC].  The administrative staff at MCC . . . truly embrac[es] diversity and foster[s] an environment of inclusion for all Correctional Staff without regards to race, gender, or ethnicity.

Then came the "but."  Switching gears, Brandt went on: "In my opinion, the 'good ole boy network' that you have worked so hard to eliminate thrives in other divisions within the [MDOC]," meaning "the Division of Probation and Parole."  According to Brandt, the hirers there had told him he "did not meet the criteria" for a probation spot, which Brandt found "odd" given his master's degree, experience in the federal system, and "vast knowledge, skills[,] and abilities."  That brought him to his point:

> Mr. Commissioner, the purpose of this letter is to make you aware that there are individual [sic] within the [MDOC] who has not adhered to the high diversity standards that you have set.  Although I am seeking better clarity on what the minimum requirements are for the positions I recently applied [to], I feel it's best to notify you regarding the problems I feel exists.  . . .
>
> Respectfully,
>
> Christopher O. Brandt

Commissioner Ponte convened a conference call with the regional administrators to discuss Brandt's letter.  Landry was on the call.  Somehow — either from the call or through the grapevine — Landry learned around that time that Brandt had made the

- 4 -

complaint. But as Landry told it in his deposition, no one on the call mentioned race or discrimination. And at the time, Landry hadn't seen the letter or heard that it raised concerns about diversity. Instead, says Landry, Ponte broached only whether "the probation side of the house was giving fair consideration" to applicants from the prison side. In any case, Landry doesn't recall if the talk prompted any changes to the hiring process.

Nothing changed for Brandt, anyway. After sending the letter, in August 2013, he applied for two more probation spots without success. By that time, Landry had moved to his current role as the Warden of MCC and no longer took part in probation officer hiring. But just as before, the interview panelists passed over Brandt to select a candidate who was already working as a probation officer assistant for MDOC and had past experience as a child protective caseworker. MDOC didn't fill the other position, which was "placed on hold" indefinitely.

On November 20, 2013, Brandt filed a formal complaint with the Maine Human Rights Commission (the "MHRC") alleging that MDOC had discriminated against him based on his age and race.

A month later — after one more fruitless interview with MDOC probation — Brandt recognized that (in his words) he "was having no luck advancing" within MDOC, "felt discriminated against by the Probation Division," and thought he'd have better prospects for "advancement" if he went back to the feds. So he applied to

work as a federal corrections officer at the Federal Correctional Institution in Berlin, New Hampshire. Given his tenure as a federal corrections officer in New York years before, he was confident he'd get the job; and sure enough, in mid-December, FCI Berlin called to offer him the slot. According to Brandt, he was slated to start there in early February 2014. So just before the new year, he resigned from the MCC, effective January 8.

But that's when things really went south. In mid-January, Berlin backtracked, telling Brandt that due to a budget sequestration, the prison couldn't hire any new employees until further notice. With his federal job up in the air, Brandt turned back to MDOC; over the next four months, he applied to four open positions with the department, including his old position at MCC. But MDOC wouldn't take him back. From the get-go, Landry (now Warden of MCC) and his deputy, Gary LaPlante, suspected that Brandt intended to use MCC as temporary safety net. When Brandt applied for rehire in late February, LaPlante emailed Landry that when he "recently spoke to [Brandt,] it sounded like he was going back to the [federal] Bureau of Prisons." (A few weeks prior, right after LaPlante interviewed Brandt for another MCC position, they discussed Brandt's application to FCI Berlin and Brandt told LaPlante there was a "hold up" due to a hiring freeze). Under the circumstances — Brandt had "just left," after all — Landry feared

he "would [] come back, stay for a short time, and then leave again."  Landry Dep. at 82.

So when LaPlante reported he caught Brandt in a lie, that was all it took.

Here's how it happened.  Given his concerns about Brandt's commitment, Landry asked Brandt's old manager, Valerie Norman, to conduct an informal interview with him to ask about "his reason for his interest in coming back to work for the [MDOC]."  During the interview, on March 11, Brandt told Norman that the job with FCI Berlin "fell through due to a hiring freeze" and that he wanted to return to MDOC and work toward a promotion, which she passed on to Landry and LaPlante the next day.  LaPlante doubted Brandt's explanation because (as the parties agree) "based on his contacts in the correctional field," he was "under the impression that FCI Berlin was not under a hiring freeze."[3]  So he did some sleuthing.  When he got Norman's email, LaPlante called an HR rep at Berlin, who told him that Berlin was *not* under a hiring freeze, and that even when the federal hiring freeze was in effect, Berlin had a waiver due to a staffing shortage at that facility.  LaPlante also asked about Brandt's job application, but

---

[3] When pressed on it in his deposition, LaPlante testified that he does not recall exactly why he believed in early 2014 that Berlin was still hiring corrections officers.

the staffer was "evasive" about that (saying that "she could not get into those matters, or something to that effect"). LaPlante Dep. at 37. Anyway, based on that phone call, LaPlante (as the parties also agree) "believed that Brandt had lied" about there being a Berlin hiring freeze, and sent an email to Landry reporting what he'd learned from Berlin HR and recommending that Brandt not be rehired.

Considering LaPlante's report, Landry concluded that Brandt had been "untruthful" about the Berlin situation and decided to reject his application for reinstatement. He doesn't recall whom he hired instead.

As it turns out, there was indeed a federal hiring freeze (and had been for three years) until February 10, 2014, when Attorney General Eric Holder lifted it. To be clear, the freeze was lifted after FCI Berlin notified Brandt he couldn't start work and before LaPlante called Berlin HR to fact-check Brandt's story. The record doesn't clear up whether Berlin ever did have a "waiver," as LaPlante's source reported. But since someone at Berlin told Brandt the hiring freeze prevented the prison from taking him on board, we'll assume (drawing all reasonable inference in Brandt's favor as we must) that Berlin was indeed subject to

the freeze.  In other words, despite what the LaPlante and Landry believed, Brandt told Norman the truth.[4]

That brings us to this case.  Brandt sued Landry and MDOC[5] in federal court for age discrimination, race discrimination, and retaliation.  In his complaint, Brandt took issue with both the probation department's repeated rejections of his job applications *and* the correction side's decision not to rehire him.

---

[4] A week after Landry decided not to rehire him, Brandt filed an amended charge with the MHRC alleging retaliation.  Landry didn't know about that charge, or the original one alleging race discrimination, until April 2014 — after all this happened.  And as we'll explain, there's no evidence that LaPlante knew about it either.

[5] Actually, Brandt sued Landry's boss, Jonathan Fitzpatrick, in his official capacity as the Commissioner of MDOC, under Title VII of the Civil Rights Act of 1964 and the Age Discrimination in Employment Act (or the ADEA).  But Title VII doesn't license suits against employees like Fitzpatrick and Landry in their individual capacities, see Fantini v. Salem State Coll., 557 F.3d 22, 30 (1st Cir. 2009), and "[w]e have ruled that a Title VII claim brought against a supervisory employee in his official capacity as an agent of the employer operates as a claim against the employer," Ríos-Colón v. Toledo-Dávila, 641 F.3d 1, 4 (1st Cir. 2011).  The district court applied the same principles to Brandt's ADEA claims against Fitzpatrick (which aren't at issue on appeal). See Brandt v. Fitzpatrick, No. 1:15-CV-461-NT, 2016 WL 7115969, at *3 (D. Me. Dec. 5, 2016).  So like the parties and the district court, we'll discuss Brandt's claims against Fitzpatrick as claims against MDOC.

In contrast, Brandt sued Landry and Lisa Nash in their individual capacities under 42 U.S.C. § 1983.  As we'll explain, Brandt dropped his § 1983 claim against Nash after discovery, and the district court granted summary judgment on his § 1983 claims against Landry along with his Title VII claim against MDOC.  And on appeal, Brandt presses only the Title VII claims against MDOC.

- 9 -

He alleged that his age and his race motivated all those rejections, and that Landry nixed his reinstatement application to retaliate against him for complaining to Commissioner Ponte and the MHRC. He initially tacked on a third defendant, Lisa Nash, who (along with Landry) interviewed Brandt for one of the 2013 probation slots. After discovery, however, Brandt dropped his age discrimination claim and his claims against Nash, leaving only his plaints that Landry and (vicariously) MDOC rejected his applications for probation-side positions and refused to rehire him based on his race and his discrimination complaints to Ponte and the MHRC. He insisted that in doing so, Landry became liable under 42 U.S.C. § 1983 and MDOC violated Title VII of the Civil Rights Act of 1964. Ultimately, the judge disagreed and granted Landry and MDOC's ensuing motions for summary judgment on those remaining claims. Brandt appeals that ruling, but only as to his Title VII claims against MDOC.

## II.  LAW

### A.  Summary Judgment Standard

We review the grant of summary judgment *de novo,* affirming only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Pina v. Children's Place, 740 F.3d 785, 795

(1st Cir. 2014) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). That means we draw all reasonable inferences in Brandt's favor; but we won't "draw *unreasonable* inferences or credit bald assertions, empty conclusions," or "rank conjecture." Id. (quoting Cabán Hernández v. Philip Morris USA, Inc., 486 F.3d 1, 8 (1st Cir. 2007)). "Even in employment discrimination cases where elusive concepts such as motive or intent are at issue, summary judgment is appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Ray v. Ropes & Gray LLP, 799 F.3d 99, 116–17 (1st Cir. 2015) (quoting Benoit v. Tech. Mfg. Corp., 331 F.3d 166, 173 (1st Cir. 2003)).

## B. Title VII: Overview

On appeal, Brandt accepts the fate of his probation-side claims, but he insists that a reasonable jury could find either that racial stereotypes influenced Landry's decision not to rehire him or that the rejection was pay-back for Brandt's complaints to Commissioner Ponte and the MHRC. For that reason, he asks us to resurrect his claims for race discrimination and retaliation against MDOC under Title VII of the Civil Rights Act of 1964.[6]

---

[6] As we noted earlier, Brandt does not appeal the dismissal of his § 1983 claims against Landry in his individual capacity. And remember, only employers like MDOC (or supervisors in their official capacity as agents of the employer) may be sued under Title VII. See Ríos-Colón, 641 F.3d at 4; Fantini, 557 F.3d at 30.

- 11 -

Thanks to that statute, employers like MDOC may not "fail or refuse to hire" someone "or otherwise . . . discriminate against [him] with respect to his compensation, terms, conditions, or privileges of employment, because of [his] race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). As we've repeatedly recognized, those words prohibit all discriminatory "practices in whatever form which create inequality in employment opportunity," Thomas v. Eastman Kodak Co., 183 F.3d 38, 59 (1st Cir. 1999) (quoting County of Washington v. Gunther, 452 U.S. 161, 180 (1981)), reaching beyond conscious racism to root out "stereotyped thinking" and "other forms of less conscious bias" in employment decisions, id. at 42, 58-61 (citing Price Waterhouse v. Hopkins, 490 U.S. 228, 239-58 (1989)); see also Ahmed v. Johnson, 752 F.3d 490, 503 (1st Cir. 2014) ("Title VII should 'not be applied in a manner that ignores the sad reality that [discriminatory] animus can all too easily warp an individual's perspective to the point that he or she never considers the member of a protected class the 'best' candidate regardless of that person's credentials'" (quoting Bray v. Marriott Hotels, 110 F.3d 986, 993 (3d Cir. 1997)).

Title VII also forbids an employer to retaliate against an employee for "oppos[ing] any [discriminatory] practice" by (for example) filing legal complaints (like Brandt's MHRC charge) or complaining to a supervisor about discrimination (like Brandt did

- 12 -

in his letter to Ponte).  Franchina v. City of Providence, 881 F.3d 32, 45 (1st Cir. 2018) (quoting 42 U.S.C. § 2000e-3(a)).  But since the parties start with Brandt's status-based (§ 2000e-2(a)(1)) claim, we will too.

### C. How to Prove Race Discrimination

Plaintiffs rarely have eyewitness or "smoking gun" evidence that reveals an employer's discriminatory motives. Theidon v. Harvard Univ., 948 F.3d 477, 495 (1st Cir. 2020) (quoting Rivera-Rivera v. Medina & Medina, Inc., 898 F.3d 77, 88 (1st Cir. 2018)).  But there are several ways to do so without it.

One path is the familiar McDonnell Douglas burden-shifting framework, named for the case that christened it.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05 (1973). Under that theory, evidence that the plaintiff belongs to a protected class and qualified for the position, but that the employer chose an equally or less qualified applicant instead, creates a "presumption that the employer unlawfully discriminated against [him]."  St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993) (quoting Texas Dept. of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981)).  Once the applicant makes out this "prima facie case," the employer, to avoid liability, has to give "some legitimate, nondiscriminatory reason for the employee's rejection."  McDonnell Douglas, 411 U.S. at 802.  If the employer provides such an explanation, "the sole remaining issue is

- 13 -

discrimination vel non"; and the plaintiff must "show by a preponderance of the evidence that [the employer's] proffered reason is pretextual and that the actual reason for the adverse employment action is discriminatory." Theidon, 948 F.3d at 495-96 (internal quotation marks omitted).

But McDonnell Douglas didn't pave the only road to relief for a plaintiff alleging status-based discrimination under Title VII. That's because a hirer's decision-making can violate the statute even if the plaintiff's race wasn't the single, "true reason" for the final decision. Price Waterhouse, 490 U.S. at 247. Rather, in passing Title VII, Congress "meant to condemn even those decisions based on a mixture of legitimate and illegitimate considerations," even if, in hindsight, a court might determine "that the [hiring] decision would have been the same if [the protected trait] had not been taken into account." Id. at 241. In such a "mixed-motive" case, the plaintiff can prove a violation if he shows that race was one "motivating factor" in the rejection, even if other reasons also played a role. Desert Palace, Inc. v. Costa, 539 U.S. 90, 94, 101-02 (2003) (holding that circumstantial evidence alone can sustain a mixed-motive verdict) (quoting 42 U.S.C. § 2000e-2(m)). If the plaintiff succeeds, the employer still has a "limited affirmative defense" if it can show it would have made the same decision even if race hadn't factored in (meaning race wasn't the "but-for" cause of the

- 14 -

failure to hire). Id. at 94 (citing 42 U.S.C. § 2000e-5(g)(2)(B)). But that defense is "limited" because it only staves off damages and compelled reinstatement — not liability, other injunctive remedies, declaratory relief, or attorneys' fees and costs. Id.

### III.  OUR TAKE

### A.  Brandt's Race-based Claim

On appeal, Brandt takes the mixed-motive route.  But under both frameworks, he had to show that Landry relied "at least in part" on racial bias or animus when he rejected Brandt's application for reinstatement.  Burns v. Johnson, 829 F.3d 1, 12 (1st Cir. 2016) (quoting Chadwick v. WellPoint, Inc., 561 F.3d 38, 45 (1st Cir. 2009)).  So "[o]ur decision here . . . is not dependent on analyzing [his] claim under each of these theories."  Id. Whichever way you slice it, he comes up short.

Brandt's argument boils down to four points.  Since the first two are related, we'll address both of them before tackling points three and four in turn.

First, Brandt urges that the way Landry treated Brandt during the January 2013 probation interview, and the way he described Brandt later, suggest that Landry relied on stereotypes about African Americans to assess Brandt's temperament, intellect, and "critical thinking" skills.  Appellant's Br. at 22—23.  He says that unlike in any of his other law enforcement interviews, Landry and his fellow panelists were all armed.  And after thirty

- 15 -

to forty minutes, Landry cut the interview short and another interviewer "escorted" Brandt out. Brandt Dep. at 110. What's more, Landry jumped to the conclusions that Brandt was a "black and white" thinker who'd need "close supervision" on the job without support in Brandt's file or interview responses.

Second, Brandt says the same stereotypes caused Landry to believe LaPlante over Brandt in the "hiring freeze" kerfuffle a year later. After all, Brandt was a Navy veteran entrusted to perform other high-level security positions, performed his job at MCC satisfactorily, and others in MDOC who'd interviewed Brandt rated his "ethics and integrity" as "excellent" and "relatively advanced." On the other hand, LaPlante's report to Landry accusing Brandt of lying about a Berlin hiring freeze was inconsistent with this evidence of Brandt's upstanding character. Plus, LaPlante got his information "outside the normal hiring channels" without Landry's express authorization, and it turned out to be false (because despite what LaPlante reported, Brandt's federal job *did* fall through due to a hiring freeze). Appellant's Br. at 25. So (Brandt urges) an unbiased manager would've believed Brandt.

In Brandt's mind, these first two points together show that Landry had a cognitive bias against Brandt because he is African American. To be clear, as we see it, Brandt doesn't argue that Landry intended to discriminate: e.g., that he conspired with LaPlante to conjure up a race-neutral pretext or that he knew

LaPlante's investigation was bogus but relied on it anyway.  See Robinson v. Town of Marshfield, 950 F.3d 21, 26 (1st Cir. 2020) (acknowledging that "an employer may be deemed to have acted pretextually if it relies for its actions toward an employee on the conclusions of an investigation that the employer knows to have been a sham").  Instead, Brandt makes a more nuanced claim: that under the circumstances, the fact that Landry "accepted LaPlante's accusation at face value without giving Brandt an opportunity to explain" is evidence of a harmful stereotype of "black dishonesty" which skewed his judgment.  Appellant's Br. at 25.  In other words, his theory more closely tracks the stereotyping claim we accepted in Thomas, 183 F.3d at 58 (holding that when an employer "evaluates employees of one race less favorably than employees of another race who have performed equivalently," and does so based on race, it violates Title VII "regardless of whether the employer consciously intended to base the evaluations on race, or simply did so because of unthinking stereotypes or bias").  Essentially, Brandt contends that a jury could find that even if Landry wasn't conscious of it, he believed LaPlante's representation was more trustworthy than Brandt's because LaPlante is white and Brandt is black.

As previously noted, before we get to Brandt's last two points, we'll address these first two — both of which go to Landry's mindset — and explain why they fail to persuade.  In

- 17 -

short, neither the 2013 probation interview nor the 2014 "hiring freeze" debacle reasonably show that racial bias motivated Landry not to take Brandt back.

*1. The 2013 Probation Interview*

Starting with Brandt's first point, neither Landry's sidearm nor his considerations during the 2013 probation-side hiring process reasonably suggest that race-based bias shaded his thinking either back then or a year later, when Brandt applied for rehire. Brandt admitted in his deposition that MDOC probation officers typically carry guns, and there's no evidence that Landry or the other panelists disarmed when they interviewed other applicants, that any interviews lasted longer than Brandt's (in fact, Brandt admits they were all asked the same questions), or that other interviewees were not similarly escorted out of the room. What's more, Brandt described *himself* in the interview as having a "black and white" view on drugs and didn't dispute that, given his lack of experience on the probation side, he would indeed need "close supervision and support at the beginning of the job." To round things off, he also doesn't dispute that the two candidates who got the jobs were the "most qualified candidate[s]" for each opening, and (unlike Brandt) both had past experience as caseworkers: again, one was a probation officer assistant at MDOC

- 18 -

and a former child protective caseworker, and the other was a federal probation officer.[7]

### 2. Hiring Freeze Debacle:  Believing LaPlante Over Brandt

So we turn to 2014, when (according to Brandt) Landry rejected his rehire request based on "bad information that branded [Brandt] a liar."  Brandt v. Fitzpatrick et al., C.A. No. 15-461-NT, slip op. at *17 (Jan. 16, 2019).  As Brandt's second line of attack, he insists that Landry's choice to trust LaPlante (who is white) over Brandt about the hiring freeze also shows Landry's race-based bias.  We don't doubt that, as Brandt maintains, centuries-old stereotypes portraying African Americans as less trustworthy than whites can creep into employer decision-making, just as they've been documented to do in other contexts.  See Sheri Lynn Johnson, Racial Imagery in Criminal Cases, 67 Tul. L. Rev.

---

[7] In the parties' consolidated statement of material facts below, Brandt "admitted" that the probation officer assistant was the most qualified candidate for one of the positions.  As for the defendants' statement (supported with citations to the record) that "the panel recommended [the federal probation officer] for the second position because he was the most qualified candidate," Brandt responded:  "Qualified.  [That candidate] lacked 'actual experience working w/case management.'"  The District of Maine's Local Rules provide that "[f]acts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted."  Rule 56(f), Local Rules of the U.S. District Court for the District of Maine.  Since Brandt didn't deny in his response that the candidate was nevertheless the "most qualified" for the position, we deem that statement admitted (as we do with other statements to which the parties responded "qualified" but did not specifically deny).

1739, 1756 (1993) (cataloguing examples of such stereotypes being invoked in prosecutorial summations). But on this record, we see no evidence that stereotyped thinking influenced Landry to believe LaPlante's report that FCI Berlin was always hiring over Brandt's statement that they weren't.

That Landry was wrong or just unreasonable to trust LaPlante over Brandt doesn't cut it. After all, "the anti-discrimination laws do not insure against" an employer's "inaccuracy or flawed business judgment"; rather, "they are designed to protect against, and to prevent, actions spurred by some discriminatory animus." Kouvchinov v. Parametric Tech. Corp., 537 F.3d 62, 67 (1st Cir. 2008). So, "to survive summary judgment, '[i]t is not enough for [a plaintiff] merely to impugn the veracity of the employer's justification' or to point to flaws in [the employer's] investigation." Rodríguez-Cardi v. MMM Holdings, Inc., 936 F.3d 40, 48-49 (1st Cir. 2019) (explaining that, "when faced with employment decisions that lack a clear discriminatory motive, '[c]ourts may not sit as super personnel departments, assessing the merits — or even the rationality — of employers' nondiscriminatory business decisions") (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 824-25 (1st Cir. 1991)). "Even the most blatant unfairness cannot, on its own, support a Title VII claim . . . unless facts and circumstances indicate that

- 20 -

discriminatory animus," or bias, "was the reason for the decision." Thomas, 183 F.3d at 64 (internal quotation marks omitted).

To illustrate, if Landry had doubted Brandt's candor without "any factual basis" despite Brandt's clean record and high ethics ratings, in circumstances (e.g., where an equally or less-qualified white man got the job) that suggested bias was the reason, Brandt's claim might have had legs. Burns, 829 F.3d at 14-15 (holding that a female employee had a triable case that her supervisor's sex-based bias motivated him to reassign her responsibilities to male employees in part because he questioned her work ethic, but not that of her male peers, and demeaned her otherwise well-regarded work product for no apparent reason); Thomas, 183 F.3d at 64 (same where new supervisor scored the plaintiff, the only black employee, lower than her similarly-performing co-workers on evaluations, had an unexplained "general disregard for her professional abilities and status," and often became "inappropriately upset or angry with [her], to the point of behaving unprofessionally").

But here, Landry had a report from his deputy (who had no apparent axe to grind against Brandt) taken straight from FCI Berlin's HR department (whom he rightfully expected to know if and when that facility was hiring). That Landry believed it doesn't reasonably show a biased motive. Nor does the fact that he didn't give Brandt a chance to explain the perceived inconsistency. See

- 21 -

Adamson v. Walgreens Co., 750 F.3d 73, 82 (1st Cir. 2014) (rejecting employee's argument that employer's failure to let him explain his side of the story showed pretext because "[w]hether a termination decision was wise or done in haste is irrelevant, so long as the decision was not made with discriminatory animus" (quoting Rivera-Aponte v. Rest. Metropol #3, Inc., 338 F.3d 9, 11 (1st Cir. 2003)).

### 3. Cat's Paw

This bring us to Brandt's third angle. Unable to show that bias warped *Landry*'s thinking, he falls back on a so-called "cat's paw" theory, under which an employer can be held liable when a decision-making official (like Landry) relies on false "information that is manipulated by another employee who harbors illegitimate animus" to take an adverse employment action. Ameen v. Amphenol Printed Circuits, Inc., 777 F.3d 63, 70 (1st Cir. 2015) (quoting Cariglia v. Hertz Equip. Rental Corp., 363 F.3d 77, 86–87 (1st Cir. 2004)); see also Staub v. Proctor Hosp., 562 U.S. 411, 422 (2011) (holding that if an employee's "supervisor performs an act motivated by [illegitimate] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable under [the Uniformed Services Employment and Reemployment Rights Act]"). Brandt argues that even if Landry himself wasn't biased, he "acted as a conduit" for LaPlante's

racial prejudice when he relied on LaPlante's report about the hiring freeze at Berlin (or lack thereof). Appellant's Br. at 28.

This claim trips over the same stumbling block: Brandt still had to show that LaPlante, himself, acted out of race-based animus. Ameen, 777 F.3d at 71. He tries to clear that hurdle by arguing that LaPlante was "looking for an excuse" not to rehire him, knew the Berlin staffer gave him bad information, and relayed it to Landry anyway to make him think that Brant lied. Appellant's Br. at 29. In other words, says Brandt, LaPlante's fact-check was a "sham" or pretext to mask his real reason for urging Landry to shut the door on Brandt. Robinson, 950 F.3d at 26. The problem is that Brandt admitted below that LaPlante genuinely believed "FCI Berlin was not under a hiring freeze" and "believed that Brandt had lied" to Valerie Norman about it. Those admissions doom Brandt's contrary argument that LaPlante lied to cover up the real (race-based) reason he wanted Brandt rejected. See Kouvchinov, 537 F.3d at 67 (explaining that to show pretext, i.e., that the employer engaged in "a deceit . . . to cover [its] tracks," "it is not enough for a plaintiff to show that the decisionmaker acted on an incorrect perception" or "information that . . . later prove[d] to be inaccurate"; instead, he "must show that the decisionmaker did not believe in the accuracy of the reason given for the adverse employment action").

Nor is there proof that racial stereotypes or bias spurred LaPlante to reach out to Berlin HR or accept what the staffer there told him. Brandt points to LaPlante's testimony that this was the first time LaPlante made a call to fact-check an applicant's story, that LaPlante didn't have friends at FCI Berlin, and that he can't remember why he knew they were hiring correctional officers. From that evidence, Brandt says, the jury could conclude LaPlante assumed Brandt was lying because he is black. However, Brandt accepts that LaPlante, whom Brandt describes as "a broker of information in corrections circles," got the scoop that Berlin was hiring from his "contacts in the correctional field." And at the time — when Brandt told Norman about the hiring freeze on March 11 — those contacts were right: the hiring freeze had ended a month earlier (on February 10). LaPlante didn't just rely on the rumors, though; he confirmed them with a reliable source. True, Berlin HR (we must assume) was wrong to say they'd had a waiver when the freeze *was* in force. But it wasn't unreasonable, let alone evidence of bias, for LaPlante to rely on facts he got straight from the horse's mouth — even if the horse turned out to be mistaken.[8]

---

[8] Brandt seizes on LaPlante's testimony that the HR staffer was "evasive" when he asked her about Brandt's job application. When asked to elaborate, LaPlante explained that she "didn't want to offer any information related to [Brandt]." A reasonable jury could not infer that an HR rep's refusal to disclose information

### 4. *John Doe Comparator*

Fourth and last, but not least, Brandt protests that there was at least one other MCC corrections officer who left for a short time before reapplying for his old spot, and he was treated differently. In his deposition, Landry testified that this "John Doe" went through a similar re-interview process: a staff member like Valerie Norman asked him why he left and now wanted to return. In John Doe's case, he'd left for "a warehouse job of some type," found the work "not challenging" and "uninteresting," and regretted his decision to leave. Brandt complains that unlike Brandt's, Doe's "reason for wanting to return . . . wasn't questioned or checked." Appellant's Br. at 25. But there's a simple reason for that: unlike with Brandt, Landry had no reason to suspect that John Doe's explanation wasn't true.[9] In contrast, as Landry testified, Brandt left "to seek out better career opportunities," but it wasn't clear what happened that made him want to come back: Brandt said there'd been a hiring freeze, but according to LaPlante (parroting a reliable source), that wasn't true. Unlike with Doe, the hiring team had "asked [Brandt] a pretty straight question" and, according to Landry's unrebutted

---

about an individual job applicant over the phone so undermined her reliability that LaPlante should not have trusted her information about the prison's hiring practices in general.

[9] So far as we can tell, there's no evidence that LaPlante was involved in John Doe's rehiring process.

testimony, they "didn't feel like [they] were getting a straight answer."  Since the undisputed facts show that Doe's situation was distinct in that key way from Brandt's, a reasonable jury could not infer from Brandt's and Doe's disparate treatment that Landry or LaPlante were biased against Brandt because of his race.  See Adamson, 750 F.3d at 82 (explaining that disparate treatment between the plaintiff and other employees is not "probative of discriminatory animus" when, as here, the comparators are not "similarly situated" to the plaintiff in all "material respects").  To cinch matters, Brandt offers no evidence based on which the jury could conclude that Doe wasn't also African American.

## B.  Brandt's Retaliation Claim

As we previewed earlier, Brandt also faults the district court for granting summary judgment on his claim that Landry (at LaPlante's urging) rejected his application for reinstatement in retaliation for Brandt's letter to Commissioner Ponte and his complaint to the MHRC.  But this claim fails as well.

To show retaliation, a plaintiff has to prove that he complained about discrimination (or otherwise "undertook protected conduct") and his "employer took a material adverse action" against him because of it.  Planadeball v. Wyndham Vacation Resorts, Inc., 793 F.3d 169, 175 (1st Cir. 2015) (quoting Medina–Rivera v. MVM, Inc., 713 F.3d 132, 139 (1st Cir. 2013)).  "Once the plaintiff makes out this prima facie case, the burden shifts to the defendant

to articulate a legitimate, non-retaliatory explanation for its actions," and if it does, "the burden shifts back to the plaintiff to show that the defendant's explanation is a pretext for unlawful retaliation." Id. In other words, a retaliation claim follows the McDonnell Douglas dance. See id. Unlike with a status-based discrimination claim, a plaintiff alleging retaliation can't rely on a mixed-motives theory; he "must show 'but-for' causation — that is, that [he] 'would [] have [been rehired] in the absence of the' protected complaints." Roy v. Correct Care Sols., LLC, 914 F.3d 52, 70–71 (1st Cir. 2019) (quoting Univ. of Texas Sw. Med. Ctr. v. Nassar, 570 U.S. 338, 360 (2013)).

For reasons we've already outlined, Brandt can't do so. To wit: neither Landry nor LaPlante knew about the MHRC complaint before they put the kibosh on Brandt's rehire bid[10] — and even if

_____

[10] Brandt argues in passing that, based on LaPlante's testimony that his "contacts in the field" clued him in to FCI Berlin's hiring status, and Landry's comment that LaPlante was "in touch with [what's going on in] the world of corrections," a reasonable jury could infer that LaPlante must have known about Brandt's November 2013 MHRC charge. But under the circumstances, that is not a reasonable inference. Maine statute provides that "[p]rior to the conclusion of [a MHRC] investigation, all information possessed by the commission relating to the investigation is confidential and may not be disclosed," except by "the commission and its employees . . . as is reasonably necessary to further the investigation." Me. Rev. Stat. tit. 5, § 4612. Below, Brandt did not contend the MHRC's investigation concluded before MDOC refused to rehire him. And he did not deny MDOC's statements that "LaPlante was not aware of the [MHRC charge]" and "was [not] consulted or involved with responding to [it]." His

- 27 -

Landry and LaPlante somehow learned that Brandt's complaint to Ponte concerned race discrimination,[11] Brandt hasn't produced any evidence their stated reasons for rejecting his 2014 application (that given Brandt's history, they were concerned he'd jump ship after a few months, and they thought he didn't give a "straight answer" about the hiring freeze) were pretextual. To do so, Brandt would have to show that these stated reasons added up to "not only a sham, but a sham intended to cover up [a retaliatory] motive." Robinson, 950 F.3d at 25; see also Kouvchinov, 537 F.3d at 67. And as we've already explained, on this record, he can't do so.[12]

_____

failure to contest those statements isn't surprising; there's no evidence LaPlante was involved in the probation-side hiring process, so there's no reason to think LaPlante would have learned about the charge until Brandt added his failure-to-rehire claim (which, of course, was after Landry failed to rehire him).

[11] The district court concluded that "[g]iven the letter's plain discussion of racially biased hiring" and Landry's spotty memory of the ensuing conference call, "a reasonable jury could conclude, despite Landry's . . . protestations, that Landry learned through the conference call with Commissioner Ponte that the letter discussed racial discrimination." Brandt, C.A. No. 15-461-NT, slip op. at *23. We don't quibble with this finding, since we agree with the district court's ultimate conclusion that Brandt failed to produce evidence showing that pretext or retaliatory animus motivated his rejection many months later.

[12] Of course, the nine-month lapse between Brandt's complaint to Ponte and when Landry rejected his reemployment application can't show but-for causation on its own. See Ahern v. Shinseki, 629 F.3d 49, 58 (1st Cir. 2010) ("Without some corroborating evidence suggestive of causation . . . a gap of several months cannot alone ground an inference of a causal connection between a complaint and an allegedly retaliatory action.").

## IV.  END

In sum, a reasonable jury could not find that the MDOC's refusal to rehire Brandt was a product of unlawful discrimination. As such, the district court's judgment is <u>affirmed</u>.